Michael A. Lopez
(ISB No. 8356)
Joseph J. Bushyhead
(Utah Bar No. 15046), *Pro Hac Vice Pending*
NEZ PERCE TRIBE
OFFICE OF LEGAL COUNSEL
P.O. Box 305
Lapwai, Idaho 83540
Telephone: (208) 843-7355
Facsimile: (208) 843-7377
mlopez@nezperce.org
joeb@nezperce.org

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NEZ PERCE TRIBE, a federally recognized Indian Tribe, <br><br> Plaintiff, <br><br> v. <br><br> U.S. FOREST SERVICE; U.S. DEPARTMENT OF AGRICULTURE; and BROOKE L. ROLLINS, in her official capacity as Secretary of the U.S. Department of Agriculture, <br><br> Defendants. | Case No. 1:25-cv-00498 <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

INTRODUCTION

1.      This action arises from Defendants' (collectively, "Forest Service" or "agency") decision to approve the Stibnite Gold Project, a large-scale open-pit gold mine in Plaintiff Nez Perce Tribe's ("Tribe") homeland, in violation of federal laws and regulations requiring the agency to analyze the environmental consequences of the proposed mine and protect natural resources in the project area, including fish, wildlife, plants, and water on which the exercise of the Tribe's Treaty rights and way of life depend.

2.      The consequences of the Forest Service's decision for the Tribe are immense. The approved Stibnite Gold Project operations area encompasses approximately 14,221 acres, of which 95% are National Forest System lands. The Tribe has occupied and used all of these lands and waters since time immemorial for subsistence, cultural, religious, ceremonial, and commercial purposes and continues to hold and exercise Treaty fishing, hunting, gathering, pasturing, and travel rights on them.

3.      As the Forest Service acknowledges in its environmental analysis, the Stibnite Gold Project's impacts on the Tribe's exercise of its Treaty rights and the preservation of the Tribe's Treaty resources in the mine area will be profound and deeply felt for generations. The Forest Service's approval authorizes Perpetua Resources Corporation ("Perpetua Resources") to mine three open pits measuring between 66 and 222 acres and 440 and 720 feet deep. One pit, the Yellow Pine Pit, will require diverting the East Fork South Fork Salmon River, a Nez Perce Treaty-reserved usual and accustomed fishing place, into a tunnel for over ten years to allow Perpetua Resources to excavate ore from beneath what is now the riverbed. Meadow Creek, a tributary of the East Fork South Fork Salmon River, will be re-routed around a new tailings

"storage facility," more appropriately characterized as a landscape-scale landfill, rising 460 feet tall that will inundate the Meadow Creek valley and create a permanent fish passage barrier.

4.      While the Stibnite Gold Project will take place in an historical mining area, only a third of the mine site disturbance will occur on historically disturbed ground. The Stibnite Gold Project contemplates clearing approximately 3,500 acres of vegetation. It will destroy hundreds of acres of wetlands—in many cases permanently and irreversibly severing the hydrologic interconnection between surface and groundwater in the mine area—and divert and degrade miles of perennial streams that serve as habitat for imperiled Chinook salmon, steelhead, and bull trout. Moreover, the Stibnite Gold Project will generate billions of pounds of waste. An estimated 115 tons of ore containing gold, silver, and antimony will be crushed and processed on site using cyanide leaching and sold commercially by Perpetua Resources. Most of the toxic tailings will be left on site in the Meadow Creek drainage, behind the storage facility impoundment. New tailings created by the mine will leach aluminum, antimony, arsenic, cadmium, copper, manganese, mercury, zinc, and other pollutants into surface water and groundwater, in and downstream of the mine area, causing irreversible impacts to the environment.

5.      The life of the Stibnite Gold Project, including construction, operations, closure, and post-closure reclamation and water treatment, is estimated to be approximately 38 years. During this time, harm to the Tribe and Tribal members will occur in myriad ways. Perpetua Resources will restrict at least a generation of Tribal members from freely accessing the site for Treaty-reserved hunting, fishing, gathering, and travel. Construction and operations will cause noise and visual impacts that will prevent Tribal members from engaging in the spiritual practices and other activities associated with these Treaty-reserved rights. The degradation and

destruction of important plant and root crops, fish habitat, and wildlife habitat in the Stibnite

Gold Project site will also hinder, if not preclude, Tribal members' ability to exercise the Tribe's

Treaty-reserved rights as well as the intergenerational transfer of knowledge, customs, and

practices unique to the area, done by the Nez Perce people since time immemorial. By the Forest

Service's own analysis, some of these impacts—including impacts to the Tribe's Treaty-reserved

fishing rights—could be permanent.

6.      The Tribe repeatedly and strenuously raised its concerns regarding the

environmental impacts of the Project on its Treaty rights and resources with the Forest Service

for nearly a decade. Yet the Forest Service ultimately decided to approve Perpetua Resources'

plans for mining, and it did so at the expense of its statutory obligations to consider and protect

National Forest resources, including those on which the Tribe's Treaty-reserved rights depend.

7.      In violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§

4321 et seq., the Forest Service framed its environmental analysis in service of Perpetua

Resources' private goals and interests and refused to carry forward for analysis any alternatives

to the company's proposed mine plan that would cause fewer environmental impacts. Instead,

the agency considered just two action alternatives that only varied by access routes to the mine

site.

8.      The Forest Service also violated its 36 C.F.R. Part 228 Subpart A regulations,

promulgated under the Forest Service Organic Administration Act ("Organic Act"), 16 U.S.C. §§

475, 551, requiring the agency to, where feasible, minimize adverse environmental impacts on

National Forest surface resources when approving hardrock mines. By authorizing Perpetua

Resources' proposed mine plan without first evaluating feasible, less impactful alternatives, the

Forest Service forewent the comparative analysis that could have allowed it to ultimately select a less impactful mine plan.

9.      In authorizing the Stibnite Gold Project, the Forest Service also violated the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1601 et seq., and its implementing regulations, which confer substantive protections to National Forest resources of paramount importance to the Tribe, such as fish, wildlife, and habitat. A planning statute, NFMA and its regulations require that Forest Service authorizations conform to forest plans delineating where and how activities can proceed in order to protect watersheds, biodiversity, and other forest resources. Because the applicable forest plans here, for the Payette and Boise National Forests, would have plainly prohibited the Stibnite Gold Project, the Forest Service amended the forest plans to fit the project. But the agency did so without following regulatory requirements that ensure any plan amendments further, rather than undermine, Congress' directives in passing NFMA. And the amendments do not go far enough—the Stibnite Gold Project still violates components in the Boise and Payette Forest Plans that protect water quality.

## NATURE OF THE ACTION

10.     The Tribe brings this action against the U.S. Forest Service, against the U.S. Department of Agriculture, and against Brooke L. Rollins in her official capacity as the Secretary of the U.S. Department of Agriculture (collectively "Defendants" or "Forest Service") pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et seq., and alleges that the Forest Service's approval of the Stibnite Gold Project is arbitrary, capricious, and contrary to law.

11.     The Tribe seeks declaratory and injunctive relief setting aside the Defendants' Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD") and

prohibiting the Forest Service from proceeding with the Stibnite Gold Project until the agency

remedies the legal violations alleged herein.

## JURISDICTION AND VENUE

12.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 because this action

arises under the laws of the United States, including the APA, NEPA, NFMA, and the Organic

Act.

13.     An actual, justiciable controversy now exists between Plaintiff and Defendants.

The requested relief is therefore proper under 28 U.S.C. §§ 2201–02 and 5 U.S.C. §§ 701–06.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because all or a

substantial part of the events or omissions giving rise to the claims herein occurred within this

judicial district and the affected lands and resources are located in this judicial district.

15.     Plaintiff has exhausted all required administrative remedies prior to bringing this

action.

16.     The federal government has waived sovereign immunity in this action pursuant to

5 U.S.C. § 702.

## PARTIES

17.     Plaintiff NEZ PERCE TRIBE is a federally recognized Indian Tribe

headquartered in Lapwai, Idaho, on the Nez Perce Reservation. The Stibnite Gold Project mine

site is geographically located within the Tribe's exclusive homeland as adjudicated by the Indian

Claims Commission[1] and within the area over which the Tribe retains Treaty-reserved rights and

resources.

---

[1] Nez Perce Tribe v. United States, Docket #175, 18 Ind. Cl. Comm. 1.

18.     Defendant U.S. FOREST SERVICE is a federal government agency within the United States Department of Agriculture that manages National Forests. The Forest Service and its officers are responsible for implementing, and ensuring compliance with, all laws and regulations applicable to the management of National Forests, including treaties with Indian tribes.

19.     Defendant U.S. DEPARTMENT OF AGRICULTURE is a department of the executive branch of the United States government, within which the Forest Service is an agency.

20.     Defendant BROOKE L. ROLLINS is the Secretary of Agriculture and, as head and highest-ranking official of the United States Department of Agriculture, she is sued in her official capacity.

<u>NEZ PERCE TRIBE'S CONNECTION TO THE AREA</u>

<u>ENCOMPASSING THE PROPOSED STIBNITE GOLD PROJECT</u>

21.     The Nez Perce, or Nimíipuu, exclusively occupied, since time immemorial, thirteen million acres encompassing large parts of what are today the states of Idaho, Oregon, and Washington—stretching from the Bitterroot Mountains west to the Blue Mountains. Nez Perce also traveled far beyond this exclusive homeland to fish, hunt, gather, pasture, and engage in trade and commerce—frequently going east to buffalo country, in what is today the state of Montana, and west along the Snake and Columbia Rivers to the Pacific Ocean. The Nez Perce's intimate knowledge and continuous use of their homeland over millennia has created a unique and reverential bond between people and place that defines Nez Perce culture and identity.

22.     In 1855, to preserve their culture and way of life, the Nez Perce negotiated a treaty with the United States ("1855 Treaty"), ceding millions of acres of its homeland—including lands within and surrounding the Stibnite Gold Project— while reserving, and the United States securing, among other guarantees, a 7.5 million acre reservation of land, as well as

sovereign rights necessary to maintain its culture and way of life. These rights included "the right of taking fish at all usual and accustomed places in common with citizens of the Territory[,] and of erecting temporary buildings for curing, together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land."[2]

23.      Shortly after ratification of the 1855 Treaty, gold was discovered near what is now the town of Pierce, Idaho, within the Tribe's newly-established reservation. The United States, unwilling to enforce its obligations under the 1855 Treaty to expel trespassing prospectors and other appropriators, instead forced the Tribe to enter into a new Treaty in 1863 ("1863 Treaty") that reduced the Tribe's 7.5-million-acre reservation to just 750,000 acres.[3] Tribal members today refer to the 1863 Treaty as the "Steal Treaty." However, the Tribe did again expressly reserve in the 1863 Treaty its sovereign fishing, hunting, gathering, pasturing, and travel rights—originally reserved in the 1855 Treaty—throughout its original homeland as well as the natural resources on which those rights depend (hereinafter referred to as "Treaty-reserved rights," "Treaty-reserved resources," or "Treaty-reserved rights and resources").[4]

24.      Nez Perce Tribal members continue to exercise the Tribe's Treaty-reserved rights in the area encompassed by and surrounding the Stibnite Gold Project. Additionally, the Tribe, as manager of its Treaty-reserved resources, has expended and continues to expend considerable time, energy, and money on fisheries restoration projects in the area encompassed by and surrounding the Stibnite Gold Project. For example, the Tribe's Department of Fisheries Resources Management works extensively throughout the South Fork Salmon River watershed, spending approximately $2.79 million annually on fisheries supplementation, research, and

---

[2] Treaty with the Nez Perces, art. III, June 11, 1855, 12 Stat. 957.
[3] Treaty with the Nez Perces, June 9, 1863, 14 Stat. 647.
[4] 1863 Treaty, art. 8.

watershed restoration work, as part of the broader Columbia River Basin salmon restoration efforts.

## STATUTORY OVERVIEW

25.    The Forest Service's administration of hardrock mining is governed by a number of federal laws and regulations including—and relevant to this action—the Mining Law of 1872, the agency's Organic Act, NFMA, and NEPA.

### Mining Law of 1872

26.    The Mining Law of 1872 governs hardrock mining on federal public lands. It declares "valuable mineral deposits" to "be free and open to exploration and purchase," so far as "not inconsistent with the laws of the United States."[5]

27.    Congress has subsequently required the Forest Service and other federal agencies to regulate mining operations to protect the lands and natural resources they administer, including by application of the following laws.

### Forest Service Organic Act

28.    The Forest Service Organic Act directs the agency to "improve and protect" national forest reserves.[6] It further requires the Forest Service to "make provisions for the protection [of the lands] against destruction by fire and depredations[.]"[7] The Forest Service must "insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction[.]"[8] Specific to mining, "persons entering the

---

[5] 30 U.S.C. § 22.
[6] 16 U.S.C. § 475.
[7] Id. § 551.
[8] Id.

national forests for the purpose of exploiting mineral resources 'must comply with the rules and regulations covering such national forests.'"[9]

29.    The Forest Service regulates mining in part pursuant to its 36 C.F.R. Part 228 Subpart A regulations. Among the regulatory requirements are those for environmental protection: all operations must be "conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources," including air and water quality and fisheries and wildlife habitat.[10] With respect to fisheries and wildlife habitat, an operator must "take all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations."[11]

## National Forest Management Act

30.    NFMA also governs the Forest Service's management of National Forest System lands. It requires the Forest Service to develop, maintain, and revise land and resource management plans, called "Forest Plans," for National Forest System units.[12] All subsequent "[r]esource plans and permits, contracts, and other instruments" must be consistent with the applicable Forest Plan.[13]

31.    Stibnite Gold Project activities span two National Forests, the Payette and Boise. The Forest Service developed Forest Plans for both forests in 2003, and they share many of the same components (i.e. objectives, standards, and guidelines) that apply to project authorizations. Relevant to this action, the Payette and Boise Forest Plans contain standards—mandatory requirements for any authorization—that limit the time period within which a project may

---

[9] Clouser v. Espy, 42 F.3d 1522, 1529 (9th Cir. 1994) (quoting 16 U.S.C. § 478).
[10] 36 C.F.R. § 228.8.
[11] Id. § 228.8(e).
[12] 16 U.S.C. § 1604(a).
[13] Id. § 1604(i).

degrade aquatic, terrestrial, and watershed resource conditions (Payette Forest Plan Standards 1301 and 1306 and Boise National Forest Standards 1919, 2005, 2010, and 2113); require upstream and downstream fish passage for any new surface water diversion in fish-bearing waters (Payette Forest Plan Standard SWST09); and require the Forest Service to ensure, within its authority, that its authorizations improve or maintain overall progress toward beneficial use attainment for Clean Water Act 303(d)-listed polluted water bodies (Boise and Payette Forest Plan Standard SWST07).

32.    NFMA allows land and resource management plans to be amended and tasks the U.S. Department of Agriculture with promulgating regulations governing amendments that, among other things, "insure consideration of the economic and environmental aspects of various systems of renewable resource management, including . . . watershed, wildlife, and fish," and "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area."[14]

33.    Pursuant to NFMA, the Forest Service promulgated planning regulations in 2012 ("2012 Planning Rule"), which requires a Forest Plan amendment in order "to add, modify, or remove one or more plan components, or to change how or where one or more plan components apply to all or part of the plan area (including management areas or geographic areas)."[15] The 2012 Planning Rule also contains substantive requirements relating to ecological, social, and economic sustainability;[16] the maintenance of diverse plant and animal communities and

---

[14] Id. § 1604(g)(3)(A)-(B).
[15] 36 C.F.R. § 219.13(a)
[16] Id. § 219.8.

persistence of native species;[17] and management for multiple uses "including outdoor recreation, range, timber, watershed, wildlife, and fish."[18]

34.     The 2012 Planning Rule also sets forth requirements for the identification and protection of species of conservation concern ("SCC"). SCC are defined as "a species, other than federally recognized threatened, endangered, proposed, or candidate species, that is known to occur in the plan area and for which the regional forester has determined that the best available scientific information indicates substantial concern about the species' capability to persist over the long-term in the plan area."[19]

35.     In 2016, the Forest Service added provisions to the 2012 Planning Rule clarifying that when amending Forest Plans, including those developed under previous planning rules, the agency must determine which substantive requirements of the 2012 Planning Rule "are directly related to the plan direction being added, modified, or removed by the amendment and apply such requirement(s) within the scope and scale of the amendment."[20]

36.     The determination of whether substantive requirements are "directly related to" the amendment must be based on both the "purpose for the amendment" as well as the amendment's "effects (beneficial or adverse)."[21] When basing a "directly related" determination on adverse effects, the Forest Service "must determine" that a substantive requirement is "directly related" when NEPA effects analysis "reveals substantial adverse effects associated with that requirement, or when the proposed amendment would substantially lessen protections for a specific resource or use."[22]

---

[17] Id. § 219.9.
[18] Id. § 219.10.
[19] Id. § 219.9(c).
[20] Id. § 219.13(b)(5).
[21] Id. § 219.13(b)(5)(i).
[22] Id. § 219.13(b)(5)(ii).

37.    For each substantive requirement of the 2012 Planning Rule that is "directly related" to the amendment, the Forest Service must "apply such requirement(s) within the scope and scale of the amendment."[23]

38.    Additionally, when amending Forest Plans developed prior to the 2012 Planning Rule, "if species of conservation concern (SCC) have not been identified for the plan area and if scoping or NEPA effects analysis for the proposed amendment reveals substantial adverse impacts to a specific species, or if the proposed amendment would substantially lessen protections for a specific species, the responsible official must determine whether such species is a potential SCC, and if so, apply section § 219.9(b) with respect to that species as if it were an SCC."[24]

## National Environmental Policy Act

39.    When considering whether to approve hardrock mining proposals, the Forest Service must comply with NEPA. NEPA is the "basic national charter for protection of the environment."[25] The law serves two purposes: first, "[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts."[26] Second, it "guarantees that the relevant information will be made available" to the public so it may play a role in the decision-making process.[27] The law ensures that federal agencies take a "hard look" at the environmental consequences of their actions before action is taken.[28]

---

[23] Id. § 219.13(b)(5).
[24] Id. § 219.13(b)(6).
[25] Ctr. for Biological Diversity v. Bernhardt, 982 F.3d 723, 734 (9th Cir. 2020) (quoting 40 C.F.R. § 1500.1(a)).
[26] Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989).
[27] Id.
[28] Blue Mountains Biodiversity Project v. Blackwood, 161 F.3d 1208, 1211 (9th Cir. 1998).

40.    For proposed mining activities amounting to "major Federal actions significantly affecting the quality of the human environment," the Forest Service must prepare an Environmental Impact Statement ("EIS")—a comprehensive study of alternatives to, and environmental effects of, the proposed action.[29]

41.    Alternatives analysis is the heart of an EIS. It provides a comparison of alternate, and potentially less environmentally impactful, ways to accomplish a proposed project. "Consideration of reasonable alternatives is necessary to ensure that the agency has before it and takes into account all possible approaches to, and potential environmental impacts of, a particular project."[30]

42.    The scope of alternatives "depends on the underlying 'purpose and need' specified by the agency for the proposed action."[31] An EIS must "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."[32] Accordingly, a purpose and need statement must be "reasonable,"[33] and cannot "unreasonably narrow[] the agency's consideration of alternatives so that the outcome is preordained."[34]

---

[29] 42 U.S.C. § 4332(2)(C).
[30] Northern Alaska Environmental Center v. Kempthorne, 457 F.3d 969, 978 (9th Cir. 2006).
[31] League of Wilderness Defs.-Blue Mountains Biodiversity Proj. v. U.S. Forest Serv., 689 F.3d 1060, 1069 (9th Cir. 2012) (internal citations omitted).
[32] 40 C.F.R. § 1502.13 (2024).
[33] Westlands Water Dist. v. U.S. Dep't of Interior, 376 F.3d 853, 865 (9th Cir. 2004).
[34] Alaska Survival v. Surface Transp. Bd., 705 F.3d 1073, 1084 (9th Cir. 2013).

FACTUAL BACKGROUND

**Stibnite Gold Project Site**

43.    The Stibnite Gold Project site is located in a high-elevation headwater valley ten miles east of the town of Yellow Pine, Idaho, where tributary streams including Meadow Creek, Fiddle Creek, and Garnet Creek join the East Fork South Fork Salmon River ("EFSFSR").

44.    The EFSFSR flows through the Stibnite Gold Project site to its confluence with Johnson Creek near Yellow Pine, Idaho, then joins the South Fork Salmon River. The South Fork Salmon River eventually joins the Salmon River, which merges with the Snake River at the Idaho-Oregon border. The Snake River then flows into the Columbia River near Pasco, Washington, which reaches the ocean near Astoria, Oregon.

45.    From the 1920s through the 1950s, the Stibnite Gold Project site was mined intensively for gold, silver, antimony, and tungsten. In the 1940s, an independent population of spring/summer Chinook salmon in the upper EFSFSR were extirpated by mining operations in the area. The site was again mined from the 1970s to the 1990s. This cumulative mining activity created a disturbed footprint with open pits, waste rock dumps, spent heap leach piles/pads, and tailings piles that remain on the landscape today.

46.    The Tribe's Department of Fisheries Resources Management, Watershed Division, initiated its work in the South Fork Salmon River watershed in 2007 with a central goal of fixing the impacts of legacy mining at the historical Stibnite Mine area. That goal included restoring volitional passage for anadromous and resident fish above the Yellow Pine Pit—work for which the landowner, in 2005, agreed to the Tribe pursuing and for which the Tribe secured grant funding from the Bonneville Power Administration to initiate. But before the Tribe could implement the fish passage project, Perpetua Resources' corporate predecessors began acquiring

patented and unpatented mining claims at the Stibnite Gold Project site and denied permission for the fish passage project. The Tribe's Department of Fisheries Resources Management redirected its fish passage restoration funds to other efforts within the EFSFSR subwatershed and larger South Fork Salmon River watershed and continues to this day to conduct extensive restoration work within them—including spawning ground surveys, fish presence monitoring, transporting adult Chinook salmon to spawn in Meadow Creek, and habitat improvements such as bridge and culvert replacements and road improvements and decommissioning.

47.    Additionally, in 2019, in an effort to stem the impacts from legacy mining, the Tribe filed a lawsuit against Perpetua Resources, then named Midas Gold, for discharges of arsenic, cyanide, mercury, and other pollutants at the Stibnite Gold Project site in violation of the Clean Water Act. The Tribe's lawsuit resulted in settlement, and Perpetua Resources negotiated a cleanup agreement with the Environmental Protection Agency and Forest Service under the Comprehensive Environmental Response, Compensation, and Liability Act. That cleanup work is ongoing at the Stibnite Gold Project site.

**Stibnite Gold Project Plan of Operations**

48.    As approved in the Forest Service's final Record of Decision, the Stibnite Gold Project mining plan of operations contemplates a massive mining project consisting of four phases: a three-year construction phase; a fifteen-year mining and ore processing operations phase; a seventeen-year surface and underground exploration phase overlapping with the first two phases; and a closure and reclamation phase beginning at the conclusion of the operations phase and extending for an undefined period of time.

49.    The construction phase will entail the building of new haul and access roads (including the Burntlog Route, a main access road bordering the Frank Church-River of No

Return Wilderness), transmission lines, cell and radio towers, groundwater wells, and surface facilities including an ore processing plant, explosives facility, and worker housing, as well as the removal of trees and other vegetation across approximately 3,500 acres.

50.    The operations phase will involve re-mining existing tailings, as well as new open pit mining of three primary mineral deposits: the Yellow Pine Pit, through which the EFSFSR currently flows; the West End Pit; and the Hangar Flats Pit. Day-to-day mining operations will entail drilling and blasting rock to remove ore and hauling ore to the on-site mill. At the mill, the ore will be crushed, mixed into a slurry, and oxidized. Gold and silver will then be leached from the slurry using cyanide and refined into doré bars. The waste slurry will be piped to the tailings storage facility—a 423-acre on-site impoundment to be built in the Meadow Creek valley behind a 460-foot-tall dam. Other waste "development rock" will be hauled to the tailings storage facility or one of four other tailings repository sites within the project area.

51.    The Yellow Pine Pit will be mined first and must be dewatered. To excavate the pit, the Forest Service's ROD authorizes construction of an approximately one-mile underground tunnel to bypass the EFSFSR around the pit. Approximately one mile of the river will flow through the tunnel for over a decade.

52.    The project's scale of disturbance will be staggering: not including the re-mining of existing tailings, the ROD authorizes mining approximately 392 million tons of material from three primary pits. Of this tonnage, approximately 280 million tons will be development rock and approximately 112 million tons will be ore. The ore will be be produced at a rate as high as 25,000 tons—or 50 million pounds—per day.

53.     The ore will be milled and refined on site. The mine will use approximately 4,000 tons of sodium cyanide annually, brought to the Project site via an estimated 167 truck delivery trips per year.

54.     After the operations phase, the mine will be closed and reclamation work will include removing facilities, reconstructing drainages and stream channels, creating artificial wetlands on lined floodplains, and revegetating denuded areas where possible. Despite planned reclamation work, the Project site will have longstanding, if not perpetual, impacts to natural resources. For example, water quality—already impaired at the site due to antimony, arsenic, and mercury pollution and elevated temperatures—will remain impaired and in some cases worsen further.

### The Tribe's Concerns with, and the Forest Service's Decision to Approve, the Stibnite Gold Project

55.     Perpetua Resources, under its former name, Midas Gold, submitted its first proposed mining plan of operations to the Forest Service in 2016. The company titled the proposed plan as a "Plan of Restoration and Operations," or "PRO." The Forest Service deemed the proposed plan of operations complete in December 2016 and, in June 2017, published its notice of preparation of an EIS in the Federal Register.

56.      The Tribe submitted scoping comments in 2017 identifying a range of concerns, including: the lack of, and need for, an accurate purpose and need statement; lack of baseline data and other environmental information necessary to perform an accurate NEPA analysis; misstatements by Midas Gold about the Tribe's Treaty-reserved rights and the Forest Service's obligations under the 1872 Mining Law; the need for the Forest Service to comply with NEPA,

NFMA, and other federal laws and regulations; and likely impacts to water quality and quantity, cultural resources, fisheries, vegetation, wildlife, and air quality.

57.     In 2019, Midas Gold submitted to the Forest Service a revised plan of operations, referred to as "ModPRO." In August 2020, the Forest Service published a draft environmental impact statement ("DEIS") for public review and comment. The Tribe's comments on the DEIS, submitted on October 27, 2020, highlighted numerous deficiencies, central among them the "deeply erroneous presumption that the Tribe's treaty-reserved rights must yield to Midas Gold's Project, even if the Project results in substantial, irreparable, and lasting harm to the Tribe's treaty rights and resources for decades and perhaps longer." The Tribe highlighted analytical flaws and omissions requiring "foundational revisions" to the DEIS to cure the defects.

58.     In December 2020, soon after the Forest Service closed the public comment period for the DEIS, Midas Gold submitted to the Forest Service a new proposed plan of operations referred to as "ModPRO2." The new proposal significantly revised and added major new project components to the ModPRO proposal, such as adding waste rock disposal in the Hangar Flat Pit, adding volume to the tailings storage facility, and creating "Stibnite Lake," a new water storage pond to be built on the backfilled Yellow Pine Pit.

59.     In October 2022, the Forest Service released a Supplemental Draft Environmental Impact Statement ("SDEIS") for review and comment. The Tribe submitted comments on January 5, 2023, which again highlighted unfixed flaws from the scoping proposal and DEIS and addressed the project's new components and new environmental analysis. These included deficiencies regarding the purpose and need statement and range of alternatives—inexplicably, the SDEIS changed the purpose and need statement from the DEIS, re-framing the statement into a pre-ordained decision to approve Perpetua Resources' proposal. The SDEIS also reduced the

number of action alternatives considered from four in the DEIS to just two: the company's ModPRO2 proposal with two different access routes—a to-be-constructed Burntlog Route or the existing Johnson Creek and Stibnite Roads. In response, the Tribe proposed five alternatives to the ModPRO2 proposal—a "Nez Perce Treaty Rights Alternative," a "No Forest Plan Amendments Alternative," a "Project Life Phases Alternative(s)," a "No Antimony Production Alternative," and an "Early Closure Alternative." The Tribe also highlighted impacts to its Treaty-reserved rights; unaddressed impacts to water, fisheries, air quality, and other resources; and violations of applicable laws and regulations, including NEPA, NFMA, the 2012 Planning Rule, the Organic Act, and the Forest Service's hardrock mining regulations.

60.     On September 6, 2024, the Forest Service published the Final Environmental Impact Statement ("FEIS") and draft Record of Decision ("draft ROD"), commencing the 45-day period for administrative objections. The FEIS acknowledged the importance of the project area to the Tribe, noting that "Tribal fishing, hunting, and plant gathering activities occurred for millennia in this area," and Nez Perce Tribal members "continue to use the analysis area and exercise their rights to fish, harvest, and gather resources from their traditional places."[35] The FEIS also acknowledged that the Stibnite Gold Project, as proposed, would both impair Tribal members' ability to exercise treaty rights and destroy underlying treaty resources: "[h]arm to fish, wildlife, and habitat would in turn impact availability and harvestability of these resources by [the Nez Perce Tribe] at their usual and accustomed fishing places and traditional hunting and gathering places."[36] Nonetheless, the Forest Service failed in the FEIS and draft ROD to address the significant legal deficiencies bearing on Treaty resources and identified in earlier comments, including the following relevant to this action:

---

[35] FEIS at ES-33.
[36] Id. at ES-34.

- Consideration of just two materially similar action alternatives and rejection of the Tribe's proposed alternatives, which foreclosed comparative analysis and an inquiry into whether middle-ground alternatives would have lessened environmental impacts;

- Adoption of a purpose and need statement limited to Perpetua Resources' sole and self-serving mine plan;

- Failure to minimize adverse impacts to National Forest surface resources, including Treaty-reserved resources, as required by 36 C.F.R. Part 228 Subpart A regulations;

- Failure to ensure that the Stibnite Gold Project complied with the Payette and Boise Forest Plans; and

- Failure to meet the procedural and substantive requirements of the 2012 Planning Rule when amending the Payette and Boise Forest Plans, including to identify and protect potential SCC.

The Tribe timely submitted its objections to the FEIS and draft ROD on October 21, 2024.

61.     The Forest Service held an objection resolution meeting with Tribal staff on December 9, 2024—a meeting that the Tribe understood would provide a forum for productive discussion about the Tribe's objections and would be used to work toward resolution of specific objections. But the meeting provided no such opportunity. As documented in a December 12, 2024, follow-up letter from the Tribe to the Forest Service, the Objection Reviewing Officer Kelly Orr did not attend the meeting. Forest Service staff "disclaimed any ability to meaningfully discuss the Tribe's objection without [her] . . . present[,]" and "provided neither an explanation

for why [she was] not included in the meeting nor advance notice of [her] absence and its implications for meaningful dialogue."[37] As further memorialized in the Tribe's December 12 letter, Forest Service staff also told Tribal staff of an "incredibly rushed timeline for objection resolution and signature of the final decision"—by the end of that month—"a timeline that precludes any good faith effort to resolve even a subset of the Tribe's objections."[38] In response to this meaningless and baffling meeting, the Tribe requested pre-decisional government-to-government consultation with the Forest Service take place on January 14, 2025.

62.    No such consultation occurred. On December 20, 2024, Kelly Orr, the Deputy Regional Forester charged with resolving the objections, sent an objection response letter to the Tribe committing to only minor changes to the final Record of Decision ("ROD") and associated documents in response to the Tribe's objections.

63.    Payette National Forest Supervisor Matthew Davis and Boise National Forest Supervisor Brant Petersen signed the final ROD on January 3, 2025. At the time the supervisors signed the ROD, many of the mitigation measures the Forest Service represented would minimize environmental impacts pursuant to 36 C.F.R. § 228.8—such as Perpetua Resources' Water Resources Monitoring Plan, Fishway Operation and Management Plan, and Fish and Aquatic Resources Mitigation Plan—had not yet been approved by the Forest Service.

64.    Upon information and belief, the Perpetua Resource's final Plan of Operations, which required modification to comply with the Forest Service's ROD, was deemed complete by the Forest Service on August 1, 2025. However, the Tribe understands that the Forest Service

---

[37] Letter from Shannon F. Wheeler, Chairman, Nez Perce Tribal Executive Committee, to Kelly Orr, Region Four Deputy Regional Forester and Objection Reviewing Officer for Stibnite Gold Project, U.S. Forest Serv. Intermountain Region (Dec. 12, 2024) at 2 (on file with the U.S. Forest Service and the Nez Perce Tribe).
[38] Id.

still needs to review and approve mitigation and monitoring plans required by the ROD and sign the final Plan of Operations before Perpetua Resources can proceed. Additionally, the Forest Service has represented to the Tribe that Perpetua Resources must submit a reclamation bond, which is still being calculated and secured by the agency. Perpetua Resources has publicly represented a goal of beginning the construction phase of the Stibnite Gold Project in fall 2025.

<u>FIRST CAUSE OF ACTION</u>

**Violation of the National Environmental Policy Act**

**(Failure to Evaluate a Reasonable Range of Alternatives)**

65.     The Tribe re-alleges and incorporates each of the preceding paragraphs.

66.     NEPA requires federal agencies to rigorously explore and objectively evaluate reasonable alternatives to a proposed action that will foster informed decision making.

67.     The Forest Service's FEIS considers just two action alternatives for the project, which only differ with respect to the access route used to access the project site. The Johnson Creek Route Alternative would use existing, albeit upgraded, roads to access the mine. The Burntlog Route Alternative would entail building a largely new access route to the east of the roads identified in the Johnson Creek Route Alternative. Otherwise, the two project alternatives are identical: mining, processing, tailing storage, and other activities at the Stibnite Gold Project site would occur as Perpetua Resources proposed in the ModPRO2. Both alternatives, according to the Forest Service's own analysis and determination, would have long-term, adverse, and potentially irreparable impacts to the Tribe's Treaty rights and resources.

68.     Additionally, the Forest Service's rationales for rejecting the Tribes' and other proposed alternatives—including a "Nez Perce Treaty Rights Alternative," a "No Forest Plan Amendments Alternative," "Project Life Phases Alternative(s)," and a "No Antimony Production

Alternative"—rely on the company's stated goals for the project, not the agency's independent authority and judgment under federal laws and regulations. All of these proposed alternatives were feasible, were practicable, and would have avoided or minimized impacts to natural resources, including the Tribe's Treaty rights and resources.

69.    The Forest Service violated NEPA by limiting its project alternatives analysis in the FEIS to just two materially identical action alternatives, by arbitrarily rejecting the Tribes' and other commentors' proposed alternatives, and by failing to otherwise develop and evaluate reasonable, feasible alternatives that would avoid or lessen environmental impacts.

70.    For these reasons, the Forest Service's FEIS violates NEPA and is arbitrary, capricious, not in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. § 706. The violations of law alleged herein prejudice and injure the Tribe's rights and interests. These injuries would be redressed by an order of this Court vacating the FEIS and ROD.

<u>SECOND CAUSE OF ACTION</u>

**Violations of the National Environmental Policy Act**

**(Unreasonably Narrow Purpose and Need Statement)**

71.    The Tribe re-alleges and incorporates each of the preceding paragraphs.

72.    An EIS must "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action."[39] A purpose and need statement must be "reasonable"[40] and cannot "unreasonably narrow[] the agency's consideration of alternatives so that the outcome is preordained."[41] And importantly, "private

---

[39] 40 C.F.R. § 1502.13 (2024).
[40] <u>Westlands Water Dist.,</u> 376 F.3d at 865.
[41] <u>Alaska Survival</u>, 705 F.3d at 1084.

interests" cannot "define the scope of the proposed project."[42] Instead, "an agency should always consider the views of Congress, expressed, to the extent that the agency can determine them, in the agency's statutory authorization to act, as well as in other congressional directives."[43] Here, these directives include the Organic Act and its regulations and NFMA and its regulations.

73.    In the Stibnite Gold Project FEIS, the Forest Service allowed Perpetua Resources' private interests—the company's proposed plan of operations—to define the purpose and need for the Stibnite Gold Project. The Forest Service states that its "purpose is to consider approval of Perpetua Resource's proposed use of the surface of [National Forest System] lands" as provided in the ModPRO2 plan of operations, "in connection with operations authorized by the U.S. mining laws."[44] The agency further states the "need" to "[c]onsider approval of [ModPRO2] . . . that, where feasible, would minimize adverse environmental impacts on [National Forest System] surface resources; and ensure that measures are included that provide for mitigation of environmental impacts and reclamation of the [National Forest System] surface disturbance."[45]

74.    In other words, and despite the Tribe's repeated requests to take a different approach, the Forest Service inappropriately deferred to Perpetua Resources' private goals and interests for the ModPRO2 plan of operations rather than acknowledge its own statutory responsibilities under federal law, resulting in adoption of an narrow purpose and need statement. Further, the Forest Service defined its narrow purpose and need statement based on two errant assumptions: first, that the Perpetua Resources' proposed plan of operations is

---

[42] Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt., 606 F.3d 1058, 1070 (9th Cir. 2010).
[43] Id. (quoting Citizens Against Burlington, Inc. v. Busey, 938 F.2d 190, 196 (D.C.Cir.1991), cert. denied, 502 U.S. 994, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991)) (alteration in original).
[44] FEIS at 1-8.
[45] Id. at 1-8.

"authorized by U.S. mining laws" when that is the Forest Service's duty to ensure; and second, the company's proposed plan of operations already, "where feasible, would minimize adverse environmental impacts" on surface resources.[46]

75.    The Forest Service thus violated NEPA by formulating the FEIS's purpose and need statement as an impermissibly narrow evaluation of whether to approve Perpetua Resources' proposed plan of operations. The Forest Service then relied on the FEIS's narrow purpose and need statement to preemptively eliminate reasonable, feasible alternatives, undermining NEPA's goal of informed decision-making.

76.    For these reasons, the Forest Service's FEIS violates NEPA and is arbitrary, capricious, not in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. § 706. The violations of law alleged herein prejudice and injure the Tribe's rights and interests. These injuries would be redressed by an order of this Court vacating the FEIS and ROD.

## THIRD CAUSE OF ACTION

### Violations of the Forest Service Organic Act

### (Failure to Comply With the 36 C.F.R. Part 228 Subpart A Regulations)

77.    The Tribe re-alleges and incorporates each of the preceding paragraphs.

78.    It is well settled that "where mining activity disturbs national forest lands, Forest Service regulation is proper."[47]

79.    Under the Forest Service's 36 C.F.R. Part 228 Subpart A hardrock mining regulations, the Forest Service cannot approve a mining plan unless it can be demonstrated that

---

[46] Id. at 1-8.
[47] 36 C.F.R. § 219.13(a).

all feasible measures have been taken to "minimize adverse impacts" on National Forest resources,[48] including "all practicable measures to protect fisheries and wildlife habitat."[49]

80. The Forest Service arbitrarily presumed Perpetua Resources' successive proposed plans of operation to be the only feasible ways for the company to develop its mining claims.

81. The Forest Service improperly rejected, and otherwise failed to develop and analyze, reasonable, feasible alternatives to Perpetua Resources' proposed plan of operations that would have allowed the company to develop its mining claims with fewer adverse impacts to National Forest resources.

82. For these reasons, the Forest Service's ROD violates the Forest Service's Organic Act and its implementing regulations and is arbitrary, capricious, not in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. § 706. The violations of law alleged herein prejudice and injure the Tribe's rights and interests. These injuries would be redressed by an order of this Court vacating the ROD.

<u>FOURTH CAUSE OF ACTION</u>

**Violation of the National Forest Management Act**

**(Failure to Ensure Consistency With the Boise and Payette Forest Plans)**

83. The Tribe re-alleges and incorporates each of the preceding paragraphs.

84. NFMA requires that the Forest Service ensure its project-level decisions are consistent with relevant Forest Plans.

85. The Stibnite Gold Project fails to conform to, and the Forest Service has failed to demonstrate consistency with, the Boise and Payette National Forests' Forest Plans because the Project as authorized fails to ensure the Stibnite Gold Project improves or maintains overall

---

[48] <u>Id.</u> § 228.8.
[49] <u>Id.</u> § 228.8(e).

progress toward beneficial use attainment for 303(d)-listed water bodies in the Project area, in violation of Boise and Payette Forest Plan Standard SWST07. Listed water bodies at the Project site include the EFSFSR, Rabbit Creek, Meadow Creek, Garnet Creek, Fiddle Creek, Midnight Creek, Hennessy Creek, and Sugar Creek. The causes for impairment include—in varying combinations for each water body—antimony, arsenic, and mercury pollution and elevated water temperatures.

86.     The Forest Service has the authority to modify or mitigate the Stibnite Gold Project to ensure improvement or maintenance of progress towards beneficial use attainment for these reaches. But as approved, the Stibnite Gold Project will perpetuate and/or worsen the impairment of some or all of these waterbodies in violation of SWST07.

87.     For these reasons, the Forest Service's ROD violates NFMA and its implementing regulations and is arbitrary, capricious, not in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. § 706. The violations of law alleged herein prejudice and injure the Tribe's rights and interests. These injuries would be redressed by an order of this Court vacating the ROD.

FIFTH CAUSE OF ACTION

**Violations of the National Forest Management Act**

**(Violations of the 2012 Planning Rule's Plan Amendment Requirements)**

88.     The Tribe re-alleges and incorporates each of the preceding paragraphs.

89.     The Forest Service's 2012 Planning Rule sets forth substantive requirements for Forest Plans developed under its terms, including for ecological, social and economic sustainability,[50] diversity of plant and animal communities (including SCC),[51] and multiple

---

[50] 36 C.F.R. § 219.8.
[51] Id. § 219.9.

use.[52] Under 2012 Planning Rule, the Forest Service must ensure that amendments to Forest Plans, including amendments to plans developed prior to the 2012 Planning Rule such as the Payette and Boise Forest Plans, comply with these substantive requirements.

90.    Two of the Forest Service's project-specific Forest Plan amendments, the "General Management Actions" amendment and "Fish Passage Diversion" amendment, bypassed the 2012 Planning Rule's substantive and procedural requirements. Additionally, the Forest Service violated the 2012 Planning Rule by failing to determine potential species of conservation concern.

General Management Actions Project-Specific Amendment Violations

91.    Payette Forest Plan Standards 1301 and 1306 and Boise National Forest Standards 1919, 2005, 2010, and 2113 limit the time periods within which aquatic, terrestrial, and watershed resource conditions may be degraded.

92.    In the Stibnite Gold Project ROD, the Forest Service amended these plan components to allow long-term degradation of aquatic, terrestrial, and watershed resource conditions within the mine site.

93.    The 2012 Planning Rule's substantive requirements concerning social and economic sustainability—including but not limited to social and cultural conditions, ecosystem services, and cultural resources and uses—are directly related to the Forest Service's plan amendment, in terms of both the amendment's purpose and effects.

94.    The 2012 Planning Rule's substantive requirements concerning integrated resource management for multiple use—including: A) reasonably foreseeable risks to ecological, social, and economic sustainability; B) system drivers such as climate change and the ability of

---

[52] Id. § 219.10.

the aquatic ecosystems on the plan area to adapt to change; and C) land use and access patterns—are directly related to the Forest Service's plan amendment, in terms of both the amendment's purpose and effects.

95.     The 2012 Planning Rule's substantive requirements regarding species of conservation concern are directly related to the Forest Service's plan amendment, in terms of both the amendment's purpose and effects.

96.     The Forest Service arbitrarily and capriciously concluded that the 2012 Planning Rule's substantive requirements concerning social and economic sustainability, multiple use, and species of conservation concern were not directly related to its amendment to Payette Forest Plan Standards 1301 and 1306 and Boise National Forest Standards 1919, 2005, 2010, and 2113. The Forest Service also failed to apply these substantive requirements within the scope and scale of the amendment.

Fish Passage Diversion Project-Specific Amendment Violations

97.     Payette Forest Plan Standard SWST09 prohibits the authorization of new surface water diversions in fish-bearing waters unless they provide upstream and downstream fish passage and, if needed, include either fish screens or other means to prevent fish entrapment/entrainment.

98.     The Forest Service amended Standard SWST09 to exempt these requirements for new surface diversions within the footprint of mining operations because, for example, diversions re-routing Meadow Creek around the tailings storage facility and buttress would create a permanent fish passage barrier. The approved tunnel diversion of the East Fork South Fork Salmon River may also partially or completely block upstream fish passage.

99.     The 2012 Planning Rule's substantive requirements concerning social and economic sustainability—including but not limited to social and cultural conditions, ecosystem services, and cultural resources and uses—are directly related to the Forest Service's plan amendment, in terms of both the amendment's purpose and effects.

100.     The 2012 Planning Rule's substantive requirements concerning integrated resource management for multiple use—including: A) reasonably foreseeable risks to ecological, social, and economic sustainability; B) system drivers such as climate change and the ability of the aquatic ecosystems on the plan area to adapt to change; and C) land use and access patterns—are directly related to the Forest Service's plan amendment, in terms of both the amendment's purpose and effects.

101.     The 2012 Planning Rule's substantive requirements regarding species of conservation concern are directly related to the Forest Service's plan amendment, in terms of both the amendment's purpose and effects.

102.     The Forest Service arbitrarily and capriciously concluded that the 2012 Planning Rule's substantive requirements concerning social and economic sustainability, multiple use, and species of conservation concern were not directly related to its amendment to Payette Forest Plan Standard SWST09. The Forest Service also failed to apply these substantive requirements within the scope and scale of the amendment.

Failure to Determine Potential Species of Conservation Concern

103.     The purpose of the General Management Actions Project-Specific Amendment and Fish Passage Diversion Project-Specific Amendment were to allow for authorization of the Stibnite Gold Project by substantially lessening protections for fish and wildlife and their habitat. The Forest Service's NEPA effects analyses, including its FEIS, reveal substantial adverse

impacts to specific species including Pacific lamprey, Western pearlshell mussels, and cutthroat trout.

104.    The Forest Service's Stibnite Gold Project-specific amendments—including the General Management Actions Project-Specific Amendment and Fish Passage Diversion Project-Specific Amendment—would substantially lessen protections for these and other species.

105.    The Forest Service was obligated to determine whether these and other species were potential SCC, and if so apply 36 C.F.R. § 219.9(b) with respect to these species as if they were SCC.

106.    The Forest Service failed to comply with these requirements concerning SCC, in violation of the 2012 Planning Rule.

107.    For these reasons, the Forest Service's ROD violates NFMA and its implementing regulations and is arbitrary, capricious, not in accordance with law, and without observance of the procedures required by law, within the meaning of the APA, 5 U.S.C. § 706. The violations of law alleged herein prejudice and injure the Tribe's rights and interests. These injuries would be redressed by an order of this Court vacating the ROD.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff Nez Perce Tribe respectfully requests that the Court:

A.    Declare the Stibnite Gold Project FEIS and ROD arbitrary, capricious, and contrary to law;

B.    Declare that the Forest Service violated NEPA by failing to analyze reasonable, feasible alternatives to the proposed action;

C.    Declare that the Forest Service violated NEPA by relying on an impermissibly narrow purpose and need statement;

D.      Declare that the Forest Service violated the Forest Service Organic Act and 36 C.F.R. Part 228 Subpart A regulations by failing to ensure that all feasible measures have been taken to minimize adverse impacts on National Forest resources;

E.      Declare that the Forest Service violated NFMA by failing to conform its authorizations to the Boise and Payette Forest Plans;

F.      Declare that the Forest Service violated NFMA by failing to comply with the 2012 Planning Rule's plan amendment requirements;

G.      Vacate the Stibnite Gold Project FEIS and ROD;

H.      Enjoin any implementation of the Stibnite Gold Project; and

I.      Grant such further relief as the Court deems necessary or appropriate to redress the Forest Service's legal violations.

DATED this 29th day of August, 2025.

Respectfully submitted,

NEZ PERCE TRIBE
OFFICE OF LEGAL COUNSEL

By:      /s/ Michael A. Lopez

Michael A. Lopez
Joseph J. Bushyhead (*Pro Hac Vice Pending*)
*Attorneys for Plaintiff Nez Perce Tribe*