Michael A. Lopez (ISB No. 8356)
Joseph J. Bushyhead (ISB No. 12968)
NEZ PERCE TRIBE
OFFICE OF LEGAL COUNSEL
P.O. Box 305
Lapwai, Idaho 83540
Telephone: (208) 843-7355
Facsimile: (208) 843-7377
mlopez@nezperce.org
joeb@nezperce.org

*Attorneys for Plaintiff Nez Perce Tribe*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| NEZ PERCE TRIBE,<br><br>Plaintiff,<br><br>v.<br><br>U.S. FOREST SERVICE, *et al.*,<br><br>Defendants,<br><br>and<br><br>PERPETUA RESOURCES IDAHO, INC.<br><br>Intervenor-Defendant. | Case No. 3:25-cv-00498-AKB<br><br>**PLAINTIFF NEZ PERCE TRIBE'S COMBINED RESPONSE/REPLY BRIEF ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

ARGUMENT ........ 1

I. THE FOREST SERVICE VIOLATED THE NATIONAL ENVIRONMENTAL POLICY ACT ........ 1

A. The FEIS's Narrow Purpose and Need Statement Preordained Selection of ModPRO2 ........ 4

1. The Forest Service Has Well-Settled Statutory Authority to Develop, Analyze, and Require Changes to Proposed Mine Plans ........ 5

2. The Administrative Record Contradicts the Forest Service's Argument that Changes to the Purpose and Need Statement were "Non-Substantive" ........ 8

B. The FEIS Contained an Unreasonably Narrow, and Unreasonably Explained, Range of Alternatives ........ 10

1. The Forest Service Failed to Explain its Reasons for Limiting the Range of Alternatives in the FEIS ........ 11

2. The FEIS Contained an Unreasonably Narrow Range of Alternatives ........ 12

II. THE FOREST SERVICE VIOLATED THE ORGANIC ACT AND ITS IMPLEMENTING REGULATIONS ........ 17

III. THE FOREST SERVICE VIOLATED THE NATIONAL FOREST MANAGEMENT ACT ........ 19

A. The Forest Service's Finding that the Stibnite Gold Project Conforms to SWST07 was Arbitrary and Capricious ........ 19

1. The Record Must Support the Forest Service's Forest Plan Consistency Determinations ........ 20

2. The Record Shows the Stibnite Gold Project Will Lead to Increases in Mercury and Arsenic in Sugar Creek, Reversing Overall Progress Toward Beneficial Use Attainment ........ 21

3. The Record Fails to Support the Forest Service's Consistency Determination for Seven 303(d)-Listed Waterbodies Within the Stibnite Gold Project Site ........ 23

B. The Forest Service Failed to Comply with the 2012 Planning Rule's Procedural and Substantive Requirements ........ 26

1. The Tribe's 2012 Planning Rule Claim is Properly Before the Court ........ 27

2. The Forest Service Failed to Provide a Rationale for Its "Not Directly Related" Determinations ........ 29

3. The Parties' Arguments Defending the Forest Service's "Not Directly Related" Determinations are *Post Hoc* and Lack Merit........................................ 31

IV. THE COURT SHOULD VACATE AND REMAND THE FOREST SERVICE'S DECISION OR, ALTERNATIVELY, ALLOW SEPARATE REMEDY BRIEFING...... 34

CONCLUSION ........................................................................................................... 35

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*All. for the Wild Rockies v. Petrick*,
68 F.4th 475 (9th Cir. 2023) ..... 27

*All. for the Wild Rockies v. U.S. Forest Serv.*,
907 F.3d 1105 (9th Cir. 2018) ..... 24, 25, 34

*Baker v. U.S. Department of Agriculture*,
928 F.Supp. 1513 (D. Idaho 1996) ..... 7

*Clouser v. Espy*,
42 F.3d 1522 (9th Cir. 1994) ..... 6, 10

*Cowpasture River Pres. Ass'n v. Forest Serv.*,
911 F.3d 150 (4th Cir. 2018) ..... 29, 31, 32

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
141 F.4th 976 (9th Cir. 2025) ..... 10, 12, 15

*Ctr. for Food Safety v. Regan*,
56 F.4th 648 (9th Cir. 2022) ..... 34

*Friends of Animals v. Burgum*,
164 F.4th 738 (9th Cir. 2026) ..... 5

*Friends of Southeast's Future v. Morrison*,
153 F.3d 1059 (9th Cir. 1998) ..... 14, 16

*Friends of Yosemite Valley v. Kempthorne*,
520 F.3d 1024 (9th Cir. 2008) ..... 10

*Greater Yellowstone Coal., Inc. v. Servheen*,
665 F.3d 1015 (9th Cir. 2011) ..... 15, 23, 25

*Idaho Conservation League v. Lannom*,
200 F. Supp. 3d 1077 (D. Idaho 2016) ..... 12, 18

*Idaho Conservation League v. U.S. Forest Serv.*
No. 1:22-CV-00225-BLW, 2023 WL 5000514 (D. Idaho Aug. 4, 2023) ..... 18

*Idaho Sporting Cong., Inc. v. Rittenhouse*,
305 F.3d 957 (9th Cir. 2002) ..... 27

*Karuk Tribe of California v. U.S. Forest Serv.*,
681 F.3d 1006 (9th Cir. 2012) ..... 6, 8

*Karuk Tribe of California v. U.S. Forest Serv.*,
640 F.3d 979 (9th Cir. 2011) ..... 8

*Kootenai Tribe of Idaho v. Veneman*,
313 F.3d 1094 (9th Cir. 2002) ..... 16

*Montana Wildlife Fed'n v. Haaland*,
127 F.4th 1 (9th Cir. 2025) ..... 35

*Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ........ 12, 16, 31

*Nat'l Parks Conservation Ass'n v. Bureau of Land Mgmt.*,
606 F.3d 1058 (9th Cir. 2010) ........ 9

*Nat'l Parks Conservation Ass'n v. United States*,
177 F. Supp. 3d 1 (D.D.C. 2016) ........ 7

*Oregon Natural Desert Ass'n v. Bureau of Land Mgmt.*,
625 F.3d 1092 (9th Cir. 2010) ........ 31

*Oregon Natural Desert Ass'n v. U.S. Forest Service*,
957 F.3d 1024 (9th Cir. 2020) ........ 20, 21, 25

*Portland Gen. Elec. Co. v. Bonneville Power*,
501 F.3d 1009 (9th Cir. 2007) ........ 13, 19, 27

*Pub. Lands for the People, Inc. v. U.S. Dep't of Agric.*,
697 F.3d 1192 (9th Cir. 2012) ........ 6

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*,
605 U.S. 168 (2025) ........ 10, 12

*State of Cal. v. Block*,
690 F.2d 753 (9th Cir. 1982) ........ 16

*The Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) ........ 21

*United States v. Locke,*
471 U.S. 84 (1985) ........ 5, 8

*United States v. Weiss*,
642 F.2d 296 (9th Cir. 1981) ........ 5, 6

*W. Watersheds Project v. Abbey*,
719 F.3d 1035 (9th Cir. 2013) ........ 10

*Wild Virginia v. U.S. Forest Serv.*,
24 F.4th 915 (4th Cir. 2022) ........ 32

*Wilderness Soc. v. U.S. Forest Serv.*,
850 F. Supp. 2d 1144 (D. Idaho 2012) ........ 25

**Statutes**

5 U.S.C. 706 ........ 33

16 U.S.C. § 475 ........ 17

16 U.S.C. § 478 ........ 5

16 U.S.C. § 551 ........ 5, 6, 17

16 U.S.C. § 1604 ........ 24

30 U.S.C. § 22 ........ 5

42 U.S.C. § 4332 .......... 14
42 U.S.C. § 4336e .......... 14

**Regulations**

36 C.F.R. § 219.8 .......... 28, 29, 30
36 C.F.R. § 219.10 .......... 28, 29, 30
36 C.F.R. § 219.13 .......... 25, 26, 31
36 C.F.R. § 219.15 .......... 19
36 C.F.R. § 228.8 .......... 17, 18

**Other Authorities**

*National Forest System Land Management Planning*,
81 Fed. Reg. 90,723 (Dec. 15, 2016) .......... 29, 31, 32

## INTRODUCTION

Plaintiff Nez Perce Tribe ("Tribe") respectfully submits this combined response in opposition to Defendants U.S. Forest Service *et al.*'s ("Forest Service" or "agency") and Intervenor-Defendant Perpetua Resources Idaho, Inc.'s ("Perpetua" or "company") cross-motions for summary judgment (ECF Nos. 46 and 44, respectively) and reply in support of its motion for summary judgment (ECF No. 39).

## ARGUMENT

### I. THE FOREST SERVICE VIOLATED THE NATIONAL ENVIRONMENTAL POLICY ACT

The Forest Service's Final Environmental Impact Statement ("FEIS") for the Stibnite Gold Project violated the National Environmental Policy Act ("NEPA") on two grounds. First, the FEIS's purpose and need was unreasonably narrow. The statement presumed that ModPRO2, the company's proposed mine plan, met the agency's statutory and regulatory obligations to protect National Forest resources, obviating any need to analyze other reasonable, more protective mine plan alternatives. NPT Opening Br. at 9–12.[1] Second, the Forest Service unreasonably limited its range of action alternatives in the FEIS—its options for a decision—to just Perpetua's ModPRO2 proposal, and did so without a reasoned explanation. *Id.* at 12–19.

In response, the Forest Service and Perpetua do not meaningfully dispute the core facts underlying the Tribe's NEPA claims. The Forest Service spent years developing different alternatives to major components of Perpetua's initial 2016 proposed mine plan, and carried

[1] Herein, the Tribe cites its opening Memorandum in Support of its Motion for Summary Judgment (ECF No. 39-2) as "NPT Opening Br." and its earlier-filed Statement of Undisputed Facts (ECF No. 39-1) as "NPT SOF." The Tribe cites the Forest Service's opening Memorandum in Support of Summary Judgment (ECF No. 46-2) as "Fed. Br." and Perpetua's opening Memorandum (ECF No. 44-2) as "Perpetua Br."

forward many alternative components as part of four action alternatives in its 2020 Draft Environmental Impact Statement ("DEIS"). NPT SOF ¶¶ 13, 19. Meanwhile, as Perpetua spurred the Forest Service to expedite its NEPA review of its proposed mine—a review that the company had contractually obligated itself to pay for—the company kept submitting new mine plans for analysis. NPT SOF ¶¶ 14–16.

In 2020, the Forest Service released, and received comments on, the DEIS, which analyzed Perpetua's then-current ModPRO mine proposal as one of four action alternatives. NPT SOF ¶¶ 19–21. The DEIS was a draft document in both name and substance. It contained significant shortcomings, particularly with respect to its alternatives analysis. NPT SOF ¶¶ 20–21. The Forest Service cataloged numerous instances in the DEIS of "incomplete and unavailable information for areas where . . . the information has been deemed essential to a reasoned choice among alternatives." FS219350; *see* FS219351–52. Among the many comments submitted by the Tribe, public, and agencies calling for additional analysis, the Environmental Protection Agency ("EPA"), in its cooperating agency role, flagged that the DEIS analyzed the effects of the alternatives differently, only providing detailed effects analysis for Alternative 2, Perpetua's ModPRO mine proposal, because the company had yet to provide information needed to fully analyze the other action alternatives. FS434127; NPT SOF ¶ 21.

Two months after the Forest Service received public comment on the 2020 DEIS, Perpetua submitted to the Forest Service its fourth and final mine plan, the ModPRO2 proposal. For Perpetua, which had decided on its final mine plan, further NEPA analysis—even just to complete the draft analysis in the DEIS—would mean paying and waiting for the Forest Service to evaluate alternatives the company had no desire to implement. *See* FS013019; FS016745; NPT SOF ¶ 17. And if the Forest Service carried forward alternatives to ModPRO2—including those from the

DEIS—the agency could require the company to make changes to ModPRO2 in order to integrate more protective alternative mine components.

So Perpetua made a business decision with significant legal risk. The company lobbied the Forest Service, in a previously undisclosed "NEPA path forward" legal memorandum, to jettison all four action alternatives from the DEIS, and to only carry forward as alternatives its final mine plan, ModPRO2, with two different access routes. FS192845; FS192833–51; NPT SOF ¶ 24.

In its legal memorandum, Perpetua made a specious and deeply flawed legal pitch for a "NEPA path forward." Perpetua told the Forest Service it could treat the DEIS, a draft document only recently released for public review and comment, as complete and fully vetted—that the agency had "clearly met its NEPA obligations in the DEIS by identifying four action alternatives along with the no action alternative and providing a robust, detailed discussion and comparison of them in the DEIS[.]" FS192847. Perpetua assured the Forest Service that in the two months between the public comment deadline and its submission of ModPRO2 it (the company, not the agency) had thoroughly vetted the DEIS and the approximately 10,000 comments the Forest Service had received on the document. Perptua also assured the Forest Service that it (again, the company, not the agency) had "evaluated" ways to reduce environmental impacts when it developed ModPRO2. The Forest Service thus, according to the company, had no need to compare ModPRO2 to other mine plans. FS192836–37.

After receiving Perpetua's legal memorandum, the Forest Service quickly pivoted. NPT SOF ¶ 25; FS226345. Rather than continue the NEPA process on course—by finalizing, in response to comments, the DEIS's action alternatives analysis and then analyzing and comparing ModPRO2 alongside a final, fully-vetted range of alternatives—the Forest Service jettisoned the four DEIS action alternatives from finalization and further consideration. *See* FS243699–700,

FS243733–34. The agency then narrowed its purpose and need statement in its subsequent NEPA analyses to presume the legal adequacy and selection of ModPRO2 and limited its range of alternatives in the FEIS to just one of the proposed mine plan's major variables: access. FS262589–605.

### A. The FEIS's Narrow Purpose and Need Statement Preordained Selection of ModPRO2

Perpetua's legal memorandum to the Forest Service provides the only plausible explanation in the record for why the Forest Service changed the purpose and need statement found in the DEIS to the version now at issue in the FEIS: to accommodate its newly narrowed range of alternatives. By presuming in the revised statement that ModPRO2 would satisfy the Forest Service's statutory obligation to protect National Forest lands and resources, the agency tipped its hand to its intention to only "carry[] forward to the FEIS alternatives that allow for a comparison of the environmental impacts between the proposed access routes[.]"[2] FS192845; NPT SOF ¶ 24–26.

Neither the Forest Service nor Perpetua provide another reason for the Forest Service's changes. Instead, they defend the purpose and need statement on two main grounds: 1) that the purpose and need statement accurately reflects the scope of the Forest Service's statutory authority with respect to mining authorizations; and 2) that revisions to the statement were "non-substantive" and did not alter the agency's alternatives analysis. The first argument fails as a matter of law, and the second fails on the record.

---

[2] The Forest Service disclaims any link between Perpetua's legal memorandum and the presumptive language added to the purpose and need statement, Fed. Br. at 13, but fails to articulate any other explanation for the revisions. Purpose and need served as the first of the agency's four alternatives screening criteria. FS243732–33.

1. The Forest Service Has Well-Settled Statutory Authority to Develop, Analyze, and Require Changes to Proposed Mine Plans

In their response briefs, the Forest Service and Perpetua defend the revised purpose and need statement by suggesting that the Mining Law of 1872 ("Mining Law") constrained the agency's statutory authority.[3] Both parties seem to argue that the Mining Law prevented the agency from rejecting (and therefore considering alternatives to) all, or components of, Perpetua's ModPRO2 proposal. They emphasize instead that the agency could add mitigation measures to ModPRO2 in order to comply with its duties under the Forest Service Organic Act ("Organic Act") to safeguard National Forest resources. Fed. Br. at 9-10; Perpetua Br. at 5-6. This explanation misstates the law.

To be sure, "[m]ining has been accorded a special place" in federal public lands law. *United States v. Weiss*, 642 F.2d 296, 299 (9th Cir. 1981). The Mining Law declared federal lands "free and open" to mineral exploration, but "under regulations prescribed by law" and "not inconsistent with the laws of the United States." 30 U.S.C. § 22. Thereafter, Congress passed the Forest Service Organic Act, which requires the Forest Service to regulate the use and occupancy of National Forests and to "preserve the forests thereon from destruction[.]" 16 U.S.C. § 551. The Organic Act allows for "prospecting, locating, and developing" mineral resources on National Forests, but only in compliance "with the rules and regulations covering such national forests." *Id.* § 478.

The Forest Service's authority to regulate mining under the Organic Act is not subservient to a miner's development rights under the Mining Law. The Ninth Circuit is clear on this point:

> [P]rivate activities can and do have more than one source of authority, and more than one source of restrictions on that authority. . . . The Mining Law and the

[3] The parties agree that the Forest Service's purpose and need statement, and therefore its range of alternatives, must reflect the "agency's statutory authorization to act." Perpetua Br. at 2–3 (quoting *Friends of Animals v. Burgum*, 164 F.4th 738, 756 (9th Cir. 2026)); *see also* Fed. Br. at 9; NPT Opening Br. at 7.

> Organic Act give miners "a statutory right, not mere privilege," to enter the National Forests for mining purposes, 39 Fed. Reg. at 31,317, but Congress has subjected that right to environmental regulation. *See* 16 U.S.C. § 478 (miners entering federal forest lands "must comply with the rules and regulations covering such national forests"); *see also United States v. Locke,* 471 U.S. 84, 104–05 (1985) (the right to mine on public lands is a "unique form of property" over which the federal government "retains substantial regulatory power" (internal quotation marks omitted)).

*Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1023 (9th Cir. 2012) (en banc). The Forest Service cannot *preclude* mining that is otherwise consistent with the laws of the United States. *See Weiss*, 642 F.2d at 299 ("[P]rospecting, locating, and developing of mineral resources in the national forests may not be prohibited nor so unreasonably circumscribed as to amount to a prohibition. . . ."). But "there can be no doubt that the [Forest Service] possesses statutory authority to regulate activities related to mining . . . in order to preserve the national forests." *Clouser v. Espy*, 42 F.3d 1522, 1530 (9th Cir. 1994) (citing 16 U.S.C. § 551).

This includes the authority to require changes to proposed mine plans. In *Clouser*, for example, claimholders challenged the Forest Service's condition that they access their claims using pack animals rather than motor vehicles. *Id.* at 1524. The court affirmed the Forest Service's authority to regulate all manner of mining activities, even if doing so would make the proposed operations less profitable: "Virtually all forms of Forest Service regulation of mining claims—for instance, *limiting the permissible methods of mining and prospecting* in order to reduce incidental environmental damage—will result in increased operating costs, and thereby will affect claim validity . . . [h]owever . . . such matters may be regulated by the Forest Service[.]" *Id.* at 1530 (emphasis added); *see also Pub. Lands for the People, Inc. v. U.S. Dep't of Agric.*, 697 F.3d 1192, 1195 (9th Cir. 2012) (affirming Forest Service limits on mining access even though the restriction would result in "a reduction of discovery of new mineral resource commodities" (internal quotation omitted)).

The Forest Service relies on *Baker v. U.S. Department of Agriculture*, 928 F.Supp. 1513 (D. Idaho 1996), to imply, if not argue outright, that the Forest Service was obligated to accept Perpetua's ModPRO2 proposal. Fed. Br. at 10 (citing FS420366 ("Rejection of the Stibnite Gold Project proposal was not an applicable option for the Forest Service due to the proponent's statutory rights under the General Mining Law of 1872.")). But *Baker* holds the opposite. The plaintiff in the case, a mining claimholder, made the same basic argument as the Forest Service and Perpetua here—that "the Forest Service must approve any reasonable Plan [of Operations], reserving only the right to impose mitigation measures." 928 F.Supp. at 1517–18. The court rejected this argument. While recognizing that "the Forest Service cannot *categorically* deny an otherwise reasonable Plan of Operations," the court found that the agency "clearly has the power to reject an unreasonable plan, and to impose conditions on the mining activity." *Id.* at 1518 (emphasis added).

The other mining case cited by the Forest Service, *National Parks Conservation Association v. United States*, 177 F. Supp. 3d 1 (D.D.C. 2016), accords with *Baker* and Ninth Circuit precedent. There, a conservation group challenged the purpose and need statement for a proposed gravel mine as unreasonably narrow because it did not allow the Forest Service to consider alternatives that would *prevent* a company's construction of the mine. *Id.* at 15. Recognizing that the company held valid mineral rights, the court found that the Forest Service "did not have the authority" to prohibit development and was therefore "not required . . . to craft a purpose and need statement that contemplated an exercise of authority that the agency did not have—denying access altogether to [the company's] dominant sub-surface estate rights." *Id.* at 16. Here, by contrast, the Tribe takes issue with the Forest Service's purpose and need statement because it presumes the legal adequacy and approval of ModPRO2, thereby obviating the need for

the Forest Service to develop and evaluate *other mining alternatives* that would still allow Perpetua to exercise its mineral rights.

Perpetua cites just one mining case in defense of the Forest Service's purpose and need statement, the Ninth Circuit's panel decision in *Karuk Tribe of California v. U.S. Forest Service*, 640 F.3d 979 (9th Cir. 2011), *rev'd en banc*, 681 F.3d 1006 (9th Cir. 2012). The company uses the case to suggest that the Mining Law limits the Forest Service's authority under the Organic Act in a manner that prohibits the agency from "'otherwise interfer[ing] with' private development of domestic minerals." Perpetua Br. at 6 (quoting *Karuk Tribe of Cal.*, 640 F.3d at 984). But the Ninth Circuit subsequently reversed the decision and, in doing so, affirmed that "the right to mine on public lands is a 'unique form of property' over which the federal government 'retains substantial regulatory power.'" *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1023 (9th Cir. 2012) (en banc) (quoting *Locke,* 471 U.S. at 104–05).

2. The Administrative Record Contradicts the Forest Service's Argument that Changes to the Purpose and Need Statement were "Non-Substantive"

Separately, the Forest Service argues that changes to the purpose and need statement after the DEIS were only "non-substantive language changes" that had no effect on the "scope of its [alternatives] analysis or decision framework." Fed. Br. at 11. But the record shows that the agency abruptly changed the scope of its alternatives analysis after releasing the DEIS for public comment (and after Perpetua submitted ModPRO2 and its legal memorandum). Before that point, the Forest Service—in keeping with its broad statutory authority to regulate mining—spent considerable time developing alternatives to various components of Perpetua's mine plan.

The record includes clear examples. In 2017, the Forest Service held an alternative development workshop with cooperating agencies to evaluate and generate alternatives for Perpetua's major proposed mine components, including tailings and development rock storage

locations, mining and processing facilities, surface water management, access routes, and reclamation. FS016803–14. The goal of the workshop was to assemble various alternative components into an "alternative *to the plan* presented in Midas Gold's [Perpetua's] Plan of Restoration and Operation[]." FS016803 (emphasis added). In 2018—as the Forest Service faced pressure from Perpetua to select a preferred alternative in the forthcoming DEIS, NPT SOF ¶ 17—agency staff flagged, in a white paper, that the company's "preferred alternative does not need to be the selected alternative in the [Record of Decision]." FS017243.

The 2020 Alternatives Development Report again shows the agency considering alternative components to Perpetua's mine plan. FS262589–605. The Report correctly recognized that "[i]n determining the range of alternatives to be considered, the emphasis is on what is 'reasonable' rather than on whether the proponent or applicant (in this case Midas Gold) likes or is itself capable of carrying out a particular alternative." FS262586–87.

The Forest Service's approach to alternatives abruptly changed when it received the ModPRO2 proposal and Perpetua's legal memorandum pitching the company's "NEPA path forward." Thereafter, the Forest Service added presumptive language to the purpose and need statement in the Supplemental DEIS ("SDEIS") and FEIS. The Tribe has found no evidence in the record that the Forest Service continued to develop or analyze alternatives to major mine plan components after 2021. To the contrary, the record shows the Forest Service abandoned its unfinished alternatives analysis in the DEIS and screened other proposed alternatives out of consideration because they would not meet "Perpetua's purpose and need for the Project." FS245536–37; FS245547–48; FS245550.

The Ninth Circuit's *National Parks Conservation Association v. Bureau of Land Management* decision controls here. The Forest Service cannot "adopt[] private interests to draft

a narrow purpose and need statement" that excludes otherwise reasonable alternatives. 606 F.3d 1058, 1072 (9th Cir. 2010). This rule applies to mining authorizations where the Forest Service maintains broad authority under the Organic Act to regulate mining to protect National Forest resources. *Clouser*, 42 F.3d at 1529–30.

### B. The FEIS Contained an Unreasonably Narrow, and Unreasonably Explained, Range of Alternatives

The Court reviews the range of alternatives in the FEIS using the "rule of reason." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 183 (2025). While NEPA does not require a specific number of alternatives, the range must be "varied enough to allow for a real, informed choice." *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1039 (9th Cir. 2008); *see also W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1051 (9th Cir. 2013) (there must be "meaningful difference between the . . . alternatives considered in detail"). The agency must also provide a "reasoned explanation" for its NEPA decisions, including which alternatives it considered and why. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 994 (9th Cir. 2025).

The Forest Service compared just two action alternatives in the FEIS for the Stibnite Gold Project and just one mine plan: 1) ModPRO2 using the Burntlog Route for access; and 2) ModPRO2 using the Johnson Creek Road for access. Despite the Forest Service's insistence in its brief, the agency never disclosed what the record now shows was its rationale for limiting alternatives to just ModPRO2. Moreover, the Forest Service arbitrarily rejected without analysis other reasonable, feasible, and possibly more environmentally protective alternatives.

1. The Forest Service Failed to Explain its Reasons for Limiting the Range of Alternatives in the FEIS

Perpetua does not dispute that the Forest Service followed the company's direction in its 2021 legal memorandum to limit the range of alternatives to ModPRO2 (they argue only that "there is no evidence in the record that [the Forest Service] blindly relied" on the memorandum, Perpetua Br. at 9). The Forest Service's position on this point is unclear. Fed. Br. at 18 n.4. They only note that the Forest Service decided against following a second, equally flawed memorandum in which Perpetua requested the agency approve ModPRO2 without any supplemental NEPA analysis of the new proposal. *Id.*

But the record is clear. On July 12, 2021—just fourteen business days after receiving Perpetua's memorandum—the Forest Service sent the Tribe a letter in which it repeated the precise "path forward" for alternatives analysis that Perpetua provided in its legal memorandum, adopting the company's roadmap as its own.[4] *Compare* FS434150–51 *with* FS192848–50.

The Forest Service insists that the agency explained its reasons for limiting alternatives to ModPRO2 in its letter to the Tribe. Fed. Br. at 17–18. But in full light of Perpetua's legal memorandum, the letter is deeply deceptive. In the letter, the Forest Service did not disclose the existence of the legal memorandum it was now acting upon or the self-interested technical and legal reasoning that Perpetua used to justify its proposed changes to the range of alternatives. *See* FS192836–51. Nor did the Forest Service explain why it had decided to rely on Perpetua's technical and legal reasoning.[5]

[4] This is the same cursory explanation the Forest Service gave in the FEIS. FS243733, FS243700.

[5] There is no evidence in the record that the Forest Service, in the fourteen days between receiving Perpetua's legal memorandum and sending its letter to the Tribe, independently evaluated Perpetua's grounds for abandoning the DEIS alternatives, including the company's predicate legal assertion that the agency had met its NEPA alternative obligations through publication of the DEIS. FS192847.

Moreover, the letter gave no indication that the Forest Service had in fact decided to limit the range of action alternatives to just ModPRO2 with two access routes for the rest of the NEPA process. When the Forest Service wrote that it was dropping previous DEIS alternatives from consideration and "expecting to analyze the proponent's current plan of operations, and the two transportation routes identified in the DEIS," FS434151, the Tribe reasonably believed the agency would develop a new suite of reasonable, feasible alternatives to ModPRO2, or its component parts, in either a SDEIS or FEIS. FS228087–101 (Tribe's alternatives comments to SDEIS).

The Forest Service's reliance on Perpetua's undisclosed, legally flawed memorandum is reason alone to vacate and remand the FEIS and Record of Decision. An agency's decision must be "reasonable and reasonably explained." *Seven Cnty.*, 605 U.S. at 180 (citing *Motor Vehicle Mfrs. Assoc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Specific to this case, "when an agency changes course" on its evaluation of alternatives, as the Forest Service did here, "it must provide a 'reasoned analysis' for that decision." *Ctr. for Biological Diversity*, 141 F.4th at 999 (citation omitted). The Forest Service needed to disclose Perpetua's legal memorandum and either "explain that it did not rely on this confidential information or, if it did rely upon it, describe the information and how it affected the agency's decision." *Idaho Conservation League v. Lannom*, 200 F. Supp. 3d 1077, 1089 (D. Idaho 2016), *amended on other grounds*, No. 1:15-CV-246-BLW, 2017 WL 242474 (D. Idaho Jan. 18, 2017). But the Forest Service altogether failed to reasonably (or honestly) explain in the record the factors that led to, and its reason for, limiting the FEIS's range of alternatives to just ModPRO2.

2. The FEIS Contained an Unreasonably Narrow Range of Alternatives

The parties primarily defend the FEIS's range of alternatives using the same reasoning as Perpetua in its legal memorandum—that the Forest Service "analyzed several action alternatives

in the DEIS," then "*further* considered two action alternatives" in the SDEIS and FEIS. Perpetua Br. at 8 (emphasis added); Fed. Br. at 15–17 (describing the "lengthy and thorough alternatives analysis" before the SDEIS and FEIS). But this explanation is disingenuous.

The Forest Service never completed the alternatives analysis in the DEIS. As discussed, the draft document contained significant data gaps precluding complete alternatives analysis. FS219350–52. Moreover, the Forest Service analyzed the effects of one alternative—Alternative 2, Perpetua's then-preferred ModPRO proposal—in greater detail than others, FS434127, not equally as necessary for comparison. FS017187. And the Forest Service never compared any of the DEIS alternatives to ModPRO2.

At Perpetua's direction, the Forest Service jettisoned all four DEIS action alternatives from finalization and further consideration. *See* FS243733, FS243700. The new ModPRO2 alternatives, therefore, did not *add* to the range carried forward in the DEIS, as the parties claim. Instead, the Forest Service *limited* the range of alternatives in the SDEIS and FEIS to avoid the need to consider and analyze alternative mine plan components to those contained in ModPRO2.

As discussed in the Tribe's Opening Brief, reasonable, feasible alternative mine plan components that met the Forest Service's screening criteria included the double-liner alternative for the tailings storage facility ("TSF"). NPT Opening Br. at 15–16. The Forest Service argues that the agency "elected to consider such options as potential mitigation."[6] Fed. Br. at 19. But the Forest

[6] Perpetua argues without elaboration that the Tribe waived arguments regarding the double-liner alternative because "[t]he Tribe's comments on the DEIS did not object to that analysis." Perpetua Br. at 13 n.4. But waiver does not apply "if an agency has had an opportunity to consider the issue. This is true even if the issue was considered sua sponte by the agency or was raised by someone other than the petitioning party." *Portland Gen. Elec. Co. v. Bonneville Power*, 501 F.3d 1009, 1024 (9th Cir. 2007) (internal citation omitted). The double-liner design was a central issue for the Forest Service and cooperating agencies during the decisionmaking process. *E.g.*, FS008894–95; FS262596. And regardless, the Tribe *also* raised numerous issues with the TSF design in its DEIS comments, including with the TSF liner, underdrain, and regulatory compliance. *E.g.*, FS424977,

Service did *not* include the double-liner as a mitigation measure. *See* FS246556–59. And allowing agencies to forego alternatives analysis and instead "consider such options as *potential* mitigation," Fed. Br. at 19 (emphasis added), creates a glaring and untenable loophole in NEPA's core requirement to "look at every reasonable alternative within the range dictated by the nature and scope of the proposal."[7] *Friends of Southeast's Future v. Morrison*, 153 F.3d 1059, 1065 (9th Cir. 1998).

The parties' other arguments attacking the need to carry forward the TSF double-liner alternative also fail. The fact that the Idaho Department of Environmental Quality ("IDEQ") amended its regulations to legalize Perpetua's preferred liner system (Fed. Br. at 19; Perpetua Br. at 13–14) does not change the double-liner's feasibility as an alternative. State regulations set a floor for compliance, not a ceiling. Moreover, the Forest Service must consider alternatives "even if outside the jurisdiction of the agency." FS262616.

The Forest Service argues without legal or record citations that the Tribe's issues with the liner are "moot or, at most, alleging harmless error" because IDEQ subsequently required a double plastic liner system in shallow groundwater areas. Fed. Br. at 19 n.5. But based on its limited description, what IDEQ may have required does not match the full alternative described by the Forest Service. FS262596. Moreover, IDEQ's requirement for a double-liner system in more

---

FS425000–02, FS425013, FS425039. Furthermore, the Tribe commented specifically on the need for supplemental NEPA analysis of the TSF component of the mine plan. FS424972–73.

[7] Separately, Perpetua argues that the text of NEPA allows the agency to limit alternatives to the ModPRO2 proposal. Perpetua Br. at 11. Perpetua points to NEPA's requirement that agencies develop "a reasonable range of alternatives to the proposed agency action . . . that are technically and economically feasible, and meet the purpose and need of *the proposal*." 42 U.S.C. § 4332(2)(C)(iii) (emphasis added). However, "proposal" does not refer to a private applicant's specific proposal but rather to the agency's proposed action. 42 U.S.C. § 4336e(12) (defining "proposal" as "a proposed action at a stage when an *agency has a goal*, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects" (emphasis added)).

sensitive areas supports the intuitive proposition that a double-liner system would be more protective than a single-liner system.

Perpetua separately claims that the Forest Service reasonably eliminated the TSF double-liner alternative after it had "analyzed both [double-liner] alternatives 'independent of the state's review' for the cyanidation permit." Perpetua Br. at 14. To be clear, the record altogether lacks evidence that the Forest Service independently and comparatively analyzed the efficacy of the two liner systems as NEPA requires. The record—including the citations provided by Perpetua—show that the *company* contracted a comparison of the two liner types, FS424116–70, then sent the comparison to the Forest Service and asked for the more expensive double-liner to "be dismissed from further consideration[]" due to a lack of an "[e]nvironmental [a]dvantage." FS424112–13. The analysis did not convince the Forest Service, which subsequently found that the double-liner system *would* confer an environmental advantage. FS262596. Furthermore, the Forest Service in the DEIS relied on Perpetua's assurances about liner designs instead of a comparative analysis, writing that the company "has indicated that the TSF liner design would be modified to meet the IDAPA regulatory requirements in effect at the time of facility permitting. Therefore, it is likely that the potential for leakage through the liner is low, and approximately equal, for all action alternatives." FS219840.

The Forest Service also failed to provide a reasoned explanation when it declined to consider and carry forward the Tribe's proposed Nez Perce Treaty Rights and No Forest Plan Amendments alternatives. *Ctr. for Biological Diversity*, 141 F.4th at 994. The Forest Service and Perpetua claim that the Tribe failed to meet its burden of describing the Nez Perce Treaty Rights alternative or of showing that the alternatives would be "feasible" or "viable." Fed. Br. at 21; Perpetua Br. at 11. But the arguments are *post hoc*. "'It is well-established that an agency's action

must be upheld, if at all, on the basis articulated by the agency itself,' not post-hoc rationalizations." *Greater Yellowstone Coal., Inc. v. Servheen*, 665 F.3d 1015, 1027 n.4 (9th Cir. 2011) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50). In the record, the Forest Service responded to the Nez Perce Treaty Rights alternative proposal by simply reciting the agency's screening criteria and to the No Forest Plan Amendments alternative by reciting the plan amendment process. FS245549–50. The agency did not reject the alternatives as nonviable, unfeasible, or too vaguely described.[8]

Separately, the Forest Service and Perpetua argue that the two ModPRO2 alternatives differ significantly in their effects because the different access routes would also affect "the construction timeline, the number and location of gravel borrow sources, recreational access, and more." Perpetua Br. at 8; Fed. Br. at 17 n.3. But the range of alternatives and detail of analysis in an EIS are "dictated by the nature and scope of the proposal." *Friends of Southeast's Future*, 153 F.3d at 1065. The proposed action in this case is a large-scale mine with many significant mine plan components, including mine production and processing, tailings storage, development rock storage, surface water management, process water management, facilities placement, and reclamation planning. FS262589–605. It is not just an access road.

Lastly, Perpetua claims the two action alternatives in the FEIS "facilitated meaningful public engagement." Perpetua Br. at 8. But the question for the Court "is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public

---

[8] Perpetua argues that the Tribe's proposal of alternatives after scoping "is contrary to the spirit of NEPA's public engagement process." Perpetua Br. at 10 n.1. But scoping "ensures that interested parties are aware of and therefore are able to participate meaningfully *in the entire EIS process, from start to finish*." *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1116 (9th Cir. 2002) (emphasis added). And the argument is not well taken. The Tribe expended considerable time and resources throughout the NEPA process to evaluate and respond to *Perpetua's* continually changing mine proposals. NPT SOF ¶ 12.

participation." *State of Cal. v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) (citation omitted). The FEIS failed on both fronts. It provided no comparison between ModPRO2 and other alternative mine plans or plan components. Rather, it foreordained selection of ModPRO2 as consequence of undisclosed lobbying by the project proponent and effectively discarded the significant work undertaken by the Tribe—reflected in hundreds of pages of comments and scores of meetings—to review, analyze, and advocate for material changes to the mine plan that would better protect Treaty rights and natural resources.

## II. THE FOREST SERVICE VIOLATED THE ORGANIC ACT AND ITS IMPLEMENTING REGULATIONS

The Forest Service's failure to consider more protective alternatives to ModPRO2 undermines its determination that it adopted "all practicable means" to avoid or minimize the Stibnite Gold Project's environmental harms, in compliance with the Organic Act.

The Organic Act requires the Forest Service to "improve and protect" National Forests from "destruction" and "depredations." 16 U.S.C. §§ 475, 551. Its implementing regulations require that "[a]ll operations shall be conducted so as, where feasible, to minimize environmental impacts on National Forest surface resources." 36 C.F.R. § 228.8. Here, the Forest Service documented compliance with 36 C.F.R. § 228.8 by stating that "[a]ll practicable means to avoid or minimize environmental harms from the *alternative* selected have been adopted." FS420804 (emphasis added); *see* Perpetua Resp. Br. at 17.

In their briefs, the Forest Service and Perpetua focus on measures the agency and other federal agencies added to the Record of Decision to mitigate ModPRO2. Perpetua. Br. at 17; Fed. Br. at 22–23. But they miss the fact that ModPRO2, the mine plan itself, presented the largest, most impactful variable, and that the Forest Service never fully evaluated more protective alternatives to ModPRO2. *See* Part I.B.2, *supra.* At Perpetua's direction, the agency ended its

unfinished analysis in the DEIS and abandoned its consideration of alternatives to major mine components such as facility locations, tailings and development rock storage areas, processing, water management, and reclamation. Consequently, the record does not support the Forest Service's determination that it evaluated "*all* practicable measures" as required by 36 C.F.R. § 228.8. In fact, it kept the largest and most consequential measures off the table.

Perpetua cites *Idaho Conservation League v. U.S. Forest Service* to argue that the mitigation measures applied to ModPRO2 are "supported by evidence" and "entitled to deference." Perpetua Br. at 16–17 (quoting No. 1:22-CV-00225-BLW, 2023 WL 5000514, at *1 (D. Idaho Aug. 4, 2023)). But the Tribe is not, for purposes of its Organic Act claim, challenging the practicability or effect of specific mitigation measures to ModPRO2. Instead, the Tribe takes issue with the fact that the Forest Service abandoned its consideration of more protective *alternatives to* ModPRO2,[9] which, in turn, undermines the determination it made pursuant to the Organic Act and 36 C.F.R. § 228.8.

This is a cognizable claim in its own right. In *Idaho Conservation League v. Lannom*, the Forest Service failed to develop an alternative that would reduce the drilling pads, trenches, and roads used for the project. 200 F. Supp. 3d at 1091. The court found this NEPA violation "directly related" to the agency's unsupported determination that it had approved the minimum necessary

---

[9] In its Opening Brief, the Tribe highlighted the TSF double-liner alternative as a clear example showing how the Forest Service's decision to limit alternatives to the mine plan undermined the agency's minimization determination pursuant to the Organic Act. Opening Br. at 21. Perpetua argues that the double-liner example is "not properly before this Court" under the administrative waiver doctrine. Perpetua Br. at 18. But as discussed, the Tribe repeatedly raised concerns with the TSF, including its liner design. *See* n.6, *supra.* And in this instance, what Perpetua frames as a novel "assertion" by the Tribe is simply a fact in the administrative record—the Forest Service's own conclusion that the double-liner alternative carried an environmental advantage over the company's proposed single-liner system. FS262596.

activities that would still allow the proponent to exercise its mineral rights. *Id.* at 1091–93. The same is true here.

## III. THE FOREST SERVICE VIOLATED THE NATIONAL FOREST MANAGEMENT ACT

### A. The Forest Service's Finding that the Stibnite Gold Project Conforms to SWST07 was Arbitrary and Capricious

Payette Forest Plan standard SWST07 provides clear, mandatory direction. The Forest Service must, "[w]ithin legal authorities, ensure that new proposed management activities within watersheds containing [Clean Water Act §] 303(d) listed [waterbodies] improve or maintain overall progress toward beneficial use attainment for pollutants that led to the listing" of those waterbodies. FS003277. The operative word in the Payette Forest Plan standard is *progress*. If an action will not improve or maintain a 303(d)-listed waterbody's progress toward attaining—enabling—its designated beneficial uses, the Forest Service must modify the action, deny the action, or amend the Forest Plan. 36 C.F.R. § 219.15(c).

It is difficult to imagine a Forest Service authorization that could have *more* of an effect on 303(d)-listed waterbodies than the Stibnite Gold Project, a water-intensive, open-pit, cyanide leach gold mine overlaying nine 303(d)-listed streams. *See* FS198720 (map showing ModPRO2 overlay on the East Fork South Fork Salmon River's network of headwater streams). Surface water quality was among the major topics of the Forest Service's decisionmaking process, *see, e.g.*, FS244663–773 (FEIS water quality analysis), and remains a primary concern of the Tribe.[10] Yet the Forest

[10] Perpetua identifies a single comment from the Tribe to argue that the Tribe waived its ability to raise deficient water quality modeling upstream of Sugar Creek. Perpetua Br. at 22 (citing FS228180). But again, Perpetua misstates the doctrine of waiver, which does not depend solely on a party's comments. *See* n.6, *supra*. And Perpetua overlooks the Tribe's extensive comments on *site-wide* surface water quality modeling and analysis, which it raised throughout the decisionmaking process. *E.g.*, FS228116–24; FS228179–88; FS421890–92, FS421899-900, FS421906, FS421910–12, FS421915–23; FS421947, FS421972–73, FS421984, FS421996–

Service summarily concluded that the Stibnite Gold Project complies with SWST07 because "[t]here are no predicted effects that pertain to the listings." FS404014.

That is not what the record shows. The Forest Service predicted water quality effects for just two of the nine 303(d)-listed waterbodies—Sugar Creek and an unspecified reach of the East Fork South Fork Salmon River. NPT Opening Br. at 25. For Sugar Creek, a waterbody impaired by elevated levels of arsenic and mercury, the Forest Service predicted slight *increases* in mercury and arsenic as a result of the Project, not progress towards attainment (*i.e.*, decreasing contaminant levels). FS244734. Moreover, the record lacks a reasonable basis for the Forest Service to conclude that the Stibnite Gold Project will maintain or improve overall progress towards attainment for the remaining seven 303(d)-listed waterbodies, a showing necessary to comply with SWST07. FS245027; FS244733.

1. <u>The Record Must Support the Forest Service's Forest Plan Consistency Determinations</u>

As an initial matter, the Forest Service and Perpetua argue that "NFMA does not require the agency to 'analyze and show' forest plan consistency in its environmental analysis documents." Fed Br. at 24; Perpetua Br. at 23 (same). For this proposition, they quote *Oregon Natural Desert Association v. U.S. Forest Service*, 957 F.3d 1024, 1033 (9th Cir. 2020). But they misstate the case's holding.

In *Oregon Natural Desert Association*, the plaintiffs alleged that for actions not *requiring NEPA analysis*, the Forest Service was required to "'analyze and show'" plan compliance "in a contemporaneous written document." 957 F.3d at 1033. The court rejected the argument, but in

---

422011, FS422026–28, FS422035–36, FS422058; FS422107, FS422128–29, FS422140–43, FS422167–69. The "agency has had an opportunity to consider the issue." *Portland Gen. Elec. Co.*, 501 F.3d at 1024.

doing so distinguished such procedural claims from those alleging "*substantive* violations of the NFMA contained within written analyses required by [NEPA]." *Id.* (emphasis added).

In keeping with the applicable holding in *Oregon Natural Desert Association,* the Tribe's substantive claim here requires the Court to "analyze[] NEPA-mandated documentation" to determine whether the Forest Service met its substantive obligation under NFMA to ensure the Stibnite Gold Project complied with the Forest Plan. *Id.* at 1034. The record must "plainly demonstrate[] that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of NFMA and the relevant Forest Plan." *Id.* at 1035 (quoting *The Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008) (internal quotation marks omitted)). It does in this case.

2. <u>The Record Shows the Stibnite Gold Project Will Lead to Increases in Mercury and Arsenic in Sugar Creek, Reversing Overall Progress Toward Beneficial Use Attainment</u>

The Forest Service and Perpetua make conflicting arguments about Sugar Creek. Contrary to the agency's predictions in the record, the Forest Service argues that mercury and arsenic levels in Sugar Creek will improve. The Forest Service first argues that the drastic increase in mercury in West End Creek—a currently unlisted creek flowing into Sugar Creek—"is not likely to result in an exceedance of water quality criteria in receiving streams, including Sugar Creek." Fed. Br. at 25 (citing FS244728). But Sugar Creek is *already* 303(d)-listed because it exceeds water quality criteria for mercury, which prevents it from supporting its beneficial uses.[11] FS248755. More

[11] The Forest Service twice claims that mercury and arsenic levels in Sugar Creek are and will remain below the strictest applicable water quality standards. Fed. Br. at 25 (citing FS244728) & 27 (citing FS244733). But the National Marine Fisheries Service ("NMFS") established a 2 ng/L (0.000002 mg/L) criterion for mercury levels in Sugar Creek, FS244849, and mercury levels in Sugar Creek will increase from 6 ng/L to 8 ng/L as a result of the Project. FS244734. Arsenic levels will range between 0.013 and 0.014 mg/L during the Project, FS244734, above NMFS' 0.010 mg/L human health criterion. FS244849.

importantly, its record cite does not support its statement about mercury levels (the Forest Service appears to have mistaken a prediction node on West End Creek for one on Sugar Creek[12]). The same is true for the agency's argument about arsenic levels. The Forest Service claims the Tribe "mischaracterizes" the agency's arsenic finding because "'predicted arsenic concentrations decrease relative to existing conditions during the operating period[.]'" Fed. Br. at 26 (quoting FS244733)). But its quoted language from the FEIS refers to either a prediction node on West End Creek or a prediction node on the East Fork South Fork Salmon River (the FEIS uses the same quoted language for both). FS244733. The language is not in reference to Sugar Creek.

Perpetua takes a different tack. The company concedes (as it must) that the FEIS predicts for Sugar Creek "a 'slight predicted increase in arsenic concentrations' . . . and 'a slight predicted increase in mercury concentrations.'" Perpetua Br. at 24 (quoting FS244734). But, using a contorted textual analysis, the company reads the word "maintain" in isolation to make the case that SWST07 allows activities that halt progress towards attainment altogether, as long as the change is not "'measurably' worse over a particular 'scale and time frame.'"[13] Perpetua Br. at 20 (quoting FS003645).

That is not the standard. The word "maintain" modifies SWST07's operative term, "overall progress." By its plain language, SWST07 requires the Forest Service to ensure activities "improve or maintain *overall progress* toward beneficial use attainment for the pollutants that led to the [303(d)] listing." FS003277 (emphasis added). In other words, it restricts the Forest Service from authorizing activities that cause pollutant level trendlines in listed waterbodies to remain static or

---

[12] *See* FS244728 (map of prediction nodes, with none on Sugar Creek) *and* FS244733 (prediction node YP-T-6 is "[i]mmediately downstream of the West End pit on West End Creek," and "above the confluence with Sugar Creek").

[13] The predicted increases to mercury and arsenic, though slight, are measurable. FS244734.

go up. This is precisely how the Forest Service interpreted SWST07 earlier in the decisionmaking making process. FS214910 (preliminarily identifying the need to amend SWST07 in 2019 because "[e]ffects due to [Stibnite Gold Project Operations] would *delay progress* towards beneficial uses attainment" (emphasis added)). And it is precisely how the Forest Service interprets SWST07 in its brief. Fed. Br. at 27 ("SWST07 requires only that the Forest Service 'maintain *overall progress* toward beneficial use attainment'" (emphasis in original)).

Additionally, both the Forest Service and Perpetua claim compliance with SWST07 because the agency added a requirement to the Record of Decision that Perpetua treat water in West End Creek for mercury to "eliminate additional loading to Sugar Creek." Perpetua Br. at 24 (citing FS420897); *see also* Fed. Br. at 25 (same). But the argument (which does not address arsenic impairment) is *post hoc* and speculative. *See Greater Yellowstone Coal.,* 665 F.3d at 1027 n.4. To the Tribe's knowledge, Perpetua has not proposed how it will treat water in West End Creek, and the Forest Service has not evaluated the efficacy of such treatment at reducing mercury levels in Sugar Creek or other downstream 303(d)-listed waterbodies.

By the Forest Service's own analysis in the FEIS, the Stibnite Gold Project will reverse Sugar Creek's overall progress towards beneficial use attainment for both mercury and arsenic. The Forest Service's finding that the Stibnite Gold Project will comply with SWST07 is arbitrary and capricious.

3. The Record Fails to Support the Forest Service's Consistency Determination for Seven 303(d)-Listed Waterbodies Within the Stibnite Gold Project Site

In addition to overlooking contrary data for Sugar Creek, the Forest Service altogether failed to support its Forest Plan consistency finding with respect to seven of the nine 303(d)-listed waterbodies in the Stibnite Gold Project site: Meadow Creek, Hennessy Creek, Midnight Creek, Garnet Creek, Rabbit Creek, Fiddle Creek, and another unspecified reach of the East Fork South

Fork Salmon River. NPT Opening Br. at 25; *see* FS248755 (listing waterbodies). Neither the Forest Service's nor Perpetua's arguments address this significant gap in the agency's analysis.

The Forest Service posits that Perpetua will divert Meadow Creek and its tributaries along with Hennessy Creek and Midnight Creek away from mine operations during the Project's operations phase and thus "keep mercury, arsenic, and antimony concentrations below standard levels." Fed. Br. at 25–26 (citing FS248830–31). But even assuming Perpetua's stream diversions will lessen contaminant levels during the Project operations phase (the Forest Service has only pointed to the agency's inference, not modeling or other data), there is no basis in the record to assume that they will lessen pollution after operations when "the diversion channels would be decommissioned, and non-contact water would follow its natural drainage pathways." FS248830. Moreover, these are only some of the 303(d)-listed waterbodies within the Stibnite Gold Project site. The Forest Service's argument does not address Garnet Creek, Rabbit Creek, Fiddle Creek, or the other unspecified reach of the East Fork South Fork Salmon River, each of which is 303(d)-listed for elevated arsenic levels and high temperatures. FS248755.

Perpetua concedes that the site-wide water chemistry model used by the Forest Service only provides overall predictions of surface water quality for a subset of 303(d)-listed streams at the Project site, and lacks prediction nodes for every listed waterbody. Perpetua Br. at 22. Rather than contest the record, the company argues that the Tribe "fails to identify any NFMA requirement" that the Forest Service predict water quality on each listed waterbody. Perpetua Br. at 22.

But Perpetua overlooks the Forest Service's basic legal obligations under NFMA and the APA. Under NFMA, "[s]ite-specific projects and activities must be consistent with an approved forest plan." *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1109 (9th Cir. 2018)

(citing 16 U.S.C. § 1604(i)). "A project is consistent if it conforms to the applicable 'components' of the forest plan[.]" *Id.* at 1110. And "[t]he Forest Service must *strictly* comply with a forest plan's 'standards,'"—in this case, SWST07—"which are considered binding limitations[.]" *Id.* (emphasis added). The APA, in turn, requires that the Forest Service "examine the relevant data and articulate a satisfactory explanation for its action"—including, in this case, the action's strict compliance with SWST07. *Id.* at 1112 (quotation and citation omitted). Perpetua has not identified, and the Tribe cannot find, analysis in the record supporting the Forest Service's compliance determination for seven of the 303(d)-listed waterbody within the Project site, as required by SWST07.

Finally, Perpetua argues generally that "the Project does improve many aspects of water quality," citing Meadow Creek and a downstream reach of the East Fork South Fork Salmon River to show that the Project will move "some impaired waters into compliance with water quality standards." Perpetua Br. at 21. But again, the argument is *post hoc*. *Greater Yellowstone Coal.*, 665 F.3d at 1027 n.4. And the argument fails regardless. As Perpetua notes, plaintiffs in a District of Idaho case involving the same SWST07 standard challenged the Forest Service for "failing to address water quality protection at the proper site-specific scale[.]" *Wilderness Soc. v. U.S. Forest Serv.*, 850 F. Supp. 2d 1144, 1168 (D. Idaho 2012). The court, in finding for the plaintiffs, recognized that "[m]erely listing the generalized benefits of the project and then concluding those actions will make conditions better than they are currently does not provide the kind of analysis required here."[14] *Id.*

[14] Perpetua tries to distinguish *Wilderness Society* as "inconsistent" with *Oregon Natural Desert Association*, 957 F.3d at 1033–34. Perpetua Br. at 21 n.7. But, as discussed above, Part III.A.1, *supra*, the Ninth Circuit's holding that the Forest Service need not "show" compliance "in a contemporaneous written document" applied *only* to procedural claims for actions *not requiring NEPA analysis*. *Wilderness Society* involved the very sort of substantive NFMA claim that the Tribe brings here.

### B. The Forest Service Failed to Comply with the 2012 Planning Rule's Procedural and Substantive Requirements

The Forest Service must determine, for any Forest Plan amendment it makes, whether the amendment is "directly related" to *each* of the 2012 Planning Rule's substantive requirements (referred to below as "standards"). 36 C.F.R. § 219.13(b). And the Forest Service must undertake two specific analyses to reach its determination: whether "the purpose for the amendment" or "the effects (beneficial or adverse) of the amendment" directly relate to *each* standard. *Id.* § 219.13(b)(5)(i). But for a number of the Forest Plan amendments it made to allow the Stibnite Gold Project to proceed, the Forest Service concluded, without rationale or any evidence of analysis, that the amendments were "not directly related" to standards of particular importance to the Tribe. FS245387–88; FS245413–15.

The Forest Service now seeks to dismiss the Tribe's claim on grounds of administrative exhaustion and waiver. Fed. Br. at 28–29; Perpetua Br. at 25. But the Tribe put the Forest Service on notice, in its comments on the DEIS and in its FEIS Objection, of its concern that the agency had failed to explain *any* of its "not directly related" determinations based on the required analyses. The Tribe's claim here is the same, just limited to the specific "not directly related" determinations that are of particular concern to the Tribe and its rights and resources.

On the merits, the Forest Service and Perpetua fail to identify any evidence in the record that the Forest Service undertook the required "purpose" and "effects" analyses for the amendments and standards the Tribe has challenged in this case. Moreover, the record contradicts the Forest Service's summary conclusions for many 2012 Planning Rule standards that "[t]his requirement is not directly related to this project-specific amendment." *E.g.*, FS245387–88; FS245413–15.

1. The Tribe's 2012 Planning Rule Claim is Properly Before the Court

Contrary to Defendants' assertions of exhaustion and waiver, the Tribe sufficiently alerted the Forest Service in its DEIS comments and FEIS Objection of its issues with the Forest Service's "not directly related" determinations. Exhaustion serves "to avoid premature claims and to ensure that the agency possessed of the most expertise in an area be given first shot at resolving a claimant's difficulties." *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002) (citation omitted). But claimants need not use "precise legal formulations," and may "alert[] the decision maker to the problem in general terms." *Id.* There is no bright-line standard for exhaustion; rather, "[c]laims must be raised with sufficient clarity to allow the decision maker to understand and rule on the issue raised." *Id.*

There is similarly no bright-line standard for waiver. *All. for the Wild Rockies v. Petrick*, 68 F.4th 475, 488 (9th Cir. 2023). The question is whether the agency was "fully apprised of the issues raised by the petitioners" during the administrative process and "had a fair opportunity to address [the] challenges." *Portland Gen. Elec. Co.*, 501 F.3d at 1024.

The Tribe raised compliance with the 2012 Planning Rule in its comments on the DEIS where it provided an overview of the framework the Forest Service was required to use to reach its "directly related" determinations. FS422051–52. The Tribe went on to alert the agency that it had failed to disclose sufficient information in the DEIS for the Tribe to determine whether the agency followed the "directly related" framework:

> The Forest's proposed amendments do not comply with the 2012 Forest Planning rule. Appendix A offers no details on the proposed amendment or any effects analysis of the amendments. . . . The decision document for an amendment must include a rationale for the responsible official's determination of the scope and scale of the amendment, which requirements within §§ 219.8 through 219.11 are directly related, and how they were applied.

FS422052 (internal citations and quotation marks omitted).

Subsequently, the Tribe in its FEIS Objection, challenged the Forest Service's failure "to ensure that the plan amendments compl[ied] with the 'directly related' requirements of the 2012 Planning Rule." FS422095. The Tribe objected on grounds that "repeatedly, the Forest Service wrongly determine[ed] that amendments are 'not directly related' to many 2012 Planning Rule requirements and wrongly asserts that amendments will meet Planning Rule requirements." *Id.* Though the Tribe objected in general terms to all unsupported "not directly related" determinations, it cited the page numbers corresponding to the specific amendments and standards now at issue. *Id*. at n.128. As a remedy, the Tribe wrote that "[t]he Forest Service must undertake and disclose an analysis in compliance with the Payette and Boise National Forest [Plans], and appropriately modify (or reject) the Project to ensure consistency." FS420419. The Forest Service response to the Tribe's objection, under the heading "Issue 3: Failure to analyze and ensure the project's compliance with the Payette and Boise National Forest Land and Resource Management Plans," concludes: "Substantive requirements of the Planning Rule at 36 CFR 219.8 to 219.10 were appropriately evaluated in the FEIS at Appendix A[.]"[15] FS420419.

The Tribe's comments and objection during the administrative process were more than sufficient for the Forest Service to understand and act on the Tribe's concern regarding the specific amendments and 2012 Planning Rule standards now at issue. The error the Tribe raised—lack of analysis or rationale supporting its "not directly related" determinations—was widespread in Appendix A. *See* FS245386–430. For purposes of judicial review here, the Tribe has pared down its claim to focus on the amendments and standards of highest concern: the General Management Actions Project-Specific Amendment ("General Amendment") and Fish Passage Diversion

[15] The Forest Service never expressed confusion or requested clarification about the Tribe's 2012 Planning Rule issues during the objection resolution meeting it held with the Tribe. *See* ECF No. 39-1 at 14–15.

Project-Specific Amendment ("Fish Passage Amendment"); and the specific 2012 Planning Rule standards that protect the social, cultural, economic, and land use and access considerations of utmost importance to the Tribe. 36 C.F.R. §§ 219.8(b)(1), (3), (5); 219.10(a)(6). Because the Tribe adequately raised the issue underpinning its claim in its DEIS comments and FEIS Objection prior to bringing its 2012 Planning Rule claim, the claim is not subject to dismissal on grounds of administrative exhaustion or waiver.

2. The Forest Service failed to provide a rationale for its "not directly related" determinations

The 2012 Planning Rule "does not give a responsible official the discretion to amend a plan in a manner contrary to the 2012 rule by selectively applying, or avoiding altogether, substantive requirements within [36 C.F.R.] §§ 219.8 through 219.11[.]" *National Forest System Land Management Planning*, 81 Fed. Reg. 90,723, 90,726 (Dec. 15, 2016). To protect against this risk, the Forest Service must show its work. The agency "must clearly document the rationale for the determination of which substantive requirements apply and how they were applied as part of the decision document." *Id.*

Both the Forest Service and Perpetua assert that the agency "documented its purpose and effects analysis." Fed. Br. at 31; *see also* Perpetua Br. at 26 (same). But neither party identifies analysis supporting the "not directly related" determinations the Tribe raises in this case. NPT Opening Br. at 26–27. And only the Forest Service tries.

For the "purpose" analysis, the Forest Service first points to the statement of purpose for the Stibnite Gold Project. Fed. Br. at 31 (citing FS245383; FS245411). But "the purpose of the *plan amendment*, not the [] project, is the focus of this analysis." *Cowpasture River Pres. Ass'n v. Forest Serv.*, 911 F.3d 150, 164 (4th Cir. 2018), *rev'd sub nom. on other grounds*, 590 U.S. 604

(2020) (emphasis in original). Using the project's purpose is a "facially incorrect application[] of the 2012 Planning Rule's 'directly related' analysis[.]" *Id.*

The Forest Service next points to the statements of purpose for the General Management and Fish Passage amendments, which, for both, is to allow otherwise-prohibited resource degradation, including to fisheries resources central to the Tribe's culture, Treaty rights, and economy. Fed. Br. at 32 (citing FS245384; FS245411). But the Forest Service points to *no analysis*, just the statements themselves.

For "effects" analysis, the Forest Service notes that the Forest Plan Consistency Appendix cross-references "specific portions of the FEIS where the effects of each proposed amendment are analyzed in detail." Fed. Br. at 32 (citing FS245384; FS245411). But in cross-referencing just "specific portions" of the FEIS, the Forest Service *entirely missed* the subject of Tribal Rights and Interests (FEIS section 4.24.2). *See* FS245178–91. In that section of the FEIS, the Forest Service acknowledged "localized, long-term to permanent, major impact to tribal treaty rights and resources including those associated with usual and accustomed fishing places." FS245186. These are not just ecological concerns.[16] The FEIS recognizes that the Tribe has "multiple and inter-related interests and associations with the local area resources (e.g., religious, traditional, and subsistence uses)," many of which "are inherently incompatible with any resources changes[.]" FS245189. Additionally, the FEIS admits that the impacts allowed by the General Management

[16] The Forest Service notes that the agency found that the General and Fish Passage amendments "directly related" to 36 C.F.R. § 219.10(a)(5), a standard that addresses "hunting, fishing, trapping, gathering, observing, subsistence, and other activities (in collaboration with federally recognized Tribes, Alaska Native Corporations, other Federal agencies, and State and local governments)." Fed. Br. at 32–33 (citing FS245391; FS245415). But this standard only addresses habitat conditions. So too do the Forest Service's rationales for meeting the standard. FS245391; FS245415. Neither the standard nor agency's rationales address the unique social, cultural, and economic importance of Treaty fishing to the Tribe. Those factors are addressed by the standards at issue in this case, 36 C.F.R. §§ 219.8(b)(1), (3), (5); 219.10(a)(6), which the Forest Service admits are "four much broader categories." Fed. Br. at 33.

and Fish Passage amendments, however localized, will "potentially disrupt[] the transfer of place-based traditional knowledge from generation to generation." FS245183.

Whether intentional or an oversight, the Forest Service made its "not directly related" determinations for the amendments and standards at issue without analyzing whether the amendments' purposes or effects were "directly related" to social, cultural, and economic conditions and land use and access, as required by 36 C.F.R. § 219.13(b)(5)(i). And it did so despite evidence in the record of substantial adverse effects bearing on these standards. *See Cowpasture River Pres. Ass'n*, 911 F.3d at 166 (remanding effects analysis where "significant evidence in the record" showed that the "amendments *would* cause substantial adverse effects" directly related to 2012 Planning Rule standards) (emphasis in original). The Forest Service's "not directly related" determinations at issue here were arbitrary and capricious.

3. <u>The Parties' Arguments Defending the Forest Service's "Not Directly Related" Determinations are *Post Hoc* and Lack Merit</u>

As discussed, the record altogether lacks evidence that the Forest Service undertook the required "purpose" and "effects" analyses for the amendments and standards at issue. However, the Forest Service and Perpetua use fresh reasoning to call the agency's "not directly related" determinations "reasonable." Perpetua argues that the amendments' purpose only indirectly relates to standards at issue. Perpetua Br. at 27–28. And both the Forest Service and Perpetua argue that the effects of the amendments are not "substantial" because 1) the Stibnite Gold Project's Operations Area Boundary represents a small percentage of the Boise and Payette National Forests; and 2) because a post-decisional "Tribal Member Site Access Plan" and fish habitat restoration will mitigate effects to Tribal members. Fed. Br. at 33–34; Perpetua Br. at 28–33.

As a threshold matter, these arguments should be rejected as *post hoc.* "It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency

itself." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50; *see also Oregon Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1120 (9th Cir. 2010) (parties cannot use "*post hoc* rationalization" to "defend past agency action against attack" (internal quotation and citation omitted)). This is especially true for the 2012 Planning Rule, where the Forest Service prescribed specific analyses for the "responsible official" to use when making "directly related" determinations. 81 Fed. Reg. at 90,726. Because the agency did not, in the record, use the parties' (or any other) rationales to support the "not directly related" determinations at issue, the Court should not entertain them here and should instead remand the determinations to the Forest Service for the proper analyses. *Cowpasture River Pres. Ass'n*, 911 F.3d at 166–67.

The parties' arguments also lack merit. Perpetua's argument that the purpose of the amendments only indirectly relates to the standards at issue fails because the 2012 Planning Rule directs "the *responsible official*" to "distinguish between rule requirements directly related to the amendment and those that may be unrelated or for which the relationship is indirect." 81 Fed. Reg. at 90,731–32 (emphasis added). Perpetua has not pointed to any place in the record where the agency conducted this analysis or made this distinction.

The parties' argument about the small proportional size of the Operations Area Boundary fails on the law and the record. The Fourth Circuit, in *Wild Virginia v. U.S. Forest Service*, 24 F.4th 915 (4th Cir. 2022), rejected a similar argument for a plan amendment for a pipeline. The Forest Service argued that the pipeline would "affect only a minimal fraction of the entire Jefferson National Forest," so "application of the existing forest plan (*i.e.*, without Pipeline-related amendments) outside this area will continue to provide adequate protections." *Id.* at 931. The court dismissed the argument on sound reasoning: "[i]f the Forest Service could circumvent the requirements of the 2012 Planning Rule simply by passing project-specific amendments on an ad

hoc basis[,] the substantive requirements in the 2012 Planning Rule would be meaningless." *Id.* at 931–32 (quoting *Cowpasture River Pres. Ass'n*, 911 F.3d at 164 (internal quotation and alteration marks omitted)). Furthermore, as the Forest Service recognized in the FEIS, "[w]hile offsite presence of tribal resources means the impact to overall fishing, hunting, pasturing, and gathering access would be negligible to minor, this would still constitute a *localized, long-term, and moderate to major impact* to tribal treaty rights specific to those tribal resources in their specific locations[.]"[17] FS245189 (emphasis added).

The Forest Service and Perpetua also point to the post-decisional Tribal Member Site Access Plan and planned fish habitat restoration to argue that effects will not be "substantial." Fed. Br. at 33–34; Perpetua Br. at 28–33. But again, the parties have not identified support in the record for their conclusions about either measure. The parties have not identified any analysis in the record that the Tribal Member Site Access Plan will, in fact, reduce effects.[18] And, the Forest Service presumably considered planned fish habitat improvements when it analyzed the Stibnite Gold Project's effects on the Tribe's rights and resources, and still found profound effects. *See* NPT Opening Br. at 33–35 (collecting record cites).

The Court should not reach the Forest Service's and Perpetua's *post hoc* arguments. The Forest Service summarily—without any analysis or explanation—concluded that the 2012 Planning Rule standards at issue, were "not directly related" to the General Amendment or Fish Passage Amendment. These determinations are arbitrary and capricious.

---

[17] The Forest Service's and Perpetua's argument that Tribal members can simply "go somewhere else" misunderstands the fundamental truth, recognized by the agency in the record, that the Tribe's "lifeways are intrinsically place-based." FS248233.

[18] The Tribe has objected to the Tribal Access Plan as wholly insufficient given the degradation and inevitable access restrictions proposed by the Stibnite Gold Project. ECF No. 39-1 at 13, 16–17.

## IV. THE COURT SHOULD VACATE AND REMAND THE FOREST SERVICE'S DECISION OR, ALTERNATIVELY, ALLOW SEPARATE REMEDY BRIEFING

The Tribe in this case challenges the Forest Service's unlawful decision to authorize the Stibnite Gold Project under the APA, and seeks the APA's presumptive remedy of vacatur. 5 U.S.C. 706(2)(A) (instructing that "the reviewing court shall" set aside agency action found to be unlawful). Remand without vacatur is only appropriate "[w]hen equity demands." *All. for the Wild Rockies*, 907 F.3d at 1121.

Both the Forest Service and Perpetua call for the Court, should it enter summary judgment in favor the Tribe, to remand the decision without vacatur. But the APA's presumptive remedy of vacatur is warranted here. The Tribe's claims highlight fundamental violations of NEPA, the Organic Act, and NFMA. Should the Tribe prevail on its NEPA and Organic Act claims, the Tribe anticipates the Forest Service will need to fully evaluate alternatives to the mine plan, including alternatives the agency may be obligated to select to protect National Forest resources. Should the Tribe prevail on its NFMA claims, the Tribe anticipates the agency will need to amend the Payette Forest Plan or change its authorization of the Stibnite Gold Project to ensure consistency with Forest Plan standards. In each instance, the Forest Service would likely adopt an altered decision on remand. *See Ctr. for Food Safety v. Regan*, 56 F.4th 648, 663–64 (9th Cir. 2022) ("When weighing the seriousness of the errors, we look to . . . whether such fundamental flaws in the agency's decision make it unlikely that the same rule would be adopted on remand" (internal quotation marks and citation omitted)).

If the Court believes that the default remedy of vacatur may *not* be warranted, the Tribe agrees with the Forest Service that "the parties should have an opportunity to submit remedy briefing for the Court's consideration." Fed. Br. at 35. Because vacatur is the presumed remedy, the burden is on the defendants to establish that equity demands a more tailored remedy. The Forest

Service has not addressed the equities, and Perpetua relies on extra-record materials that are not properly before the Court for purposes of summary judgment. ECF No. 47-1.

## CONCLUSION

For these reasons, the Tribe respectfully requests that the Court enter summary judgment in its favor, deny the Forest Service's and Perpetua's cross-motions for summary judgment, and vacate and remand the Forest Service's FEIS and Record of Decision to cure the errors and deficiencies identified herein.[19]

Respectfully submitted this 13th day of May, 2026.

NEZ PERCE TRIBE
OFFICE OF LEGAL COUNSEL

By: /s/ Joseph J. Bushyhead .
Michael A. Lopez (ISB No. 8356)
Joseph J. Bushyhead (ISB No. 12968)

*Attorneys for Plaintiff Nez Perce Tribe*

[19] Perpetua, citing inapposite case law, argues that the Tribe has "waived any request for permanent injunctive relief." Perpetua Br. at 33. Not so. The Tribe has requested vacatur and remand of the FEIS and Record of Decision to the Forest Service to cure its NEPA, Organic Act, and NFMA violations. NPT Opening Br. at 35. Because the Tribe has asked the Court to both vacate the Record of Decision and compel compliance, its requested relief is injunctive in nature. *Montana Wildlife Fed'n v. Haaland*, 127 F.4th 1, 29–30 (9th Cir. 2025). The Tribe has not waived its right to a permanent injunction or any other forms of injunctive relief requested in its Complaint. *See* ECF No. 1 at 32–33.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 13, 2026, I caused a true and correct copy of the foregoing to be filed and served electronically via CM/ECF, which caused all parties or counsel to be served by electronic means.

By: /s/ Joseph J. Bushyhead
Joseph J. Bushyhead

*Attorney for Plaintiff Nez Perce Tribe*