ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

EMMA L. HAMILTON (CA Bar No. 325360)
Trial Attorney
Natural Resources Section
c/o United States Attorney's Office
201 Third Street, N.W., Suite 900
Albuquerque, New Mexico 87102
(202) 305-5689
emma.hamilton@usdoj.gov

BART M. DAVIS
United States Attorney
District of Idaho

*Attorneys for Federal Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| NEZ PERCE TRIBE,<br><br>Plaintiff,<br><br>v.<br><br>U.S. FOREST SERVICE, *et al.*,<br><br>Federal Defendants,<br><br>and<br><br>PERPETUA RESOURCES IDAHO, INC.,<br><br>Defendant-Intervenor. | Case No. 3:25-cv-00498-AKB<br><br>**FEDERAL DEFENDANTS' REPLY IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

INTRODUCTION ........ 1

ARGUMENT ........ 1

I. THE FOREST SERVICE FULLY COMPLIED WITH NEPA ........ 1

A. The Forest Service Rationally and Reasonably Relied on Fewer Alternatives in the SDEIS and FEIS than in the DEIS ........ 2

1. Elimination of DEIS Alternatives 1, 2, and 3 was reasonably explained ........ 2

2. The purpose and need statement in the FEIS did not preordain selection of the 2021 MMP or result in the elimination of DEIS alternatives ........ 4

3. The Forest Service did not improperly rely on Perpetua's "NEPA path forward" memoranda ........ 6

B. The Range of Alternatives Considered in the FEIS is Reasonable and Lawful ........ 8

II. THE FOREST SERVICE FULFILLED ITS ORGANIC ACT OBLIGATIONS ........ 10

III. THE PROJECT COMPLIES WITH NFMA ........ 12

A. The Project is Consistent with SWST07 ........ 12

1. The Forest Service's water chemistry predictions for Sugar Creek are consistent with SWST07 ........ 12

2. SWST07 does not require individual modelling for each water body ........ 15

B. The Forest Service Complied with the 2012 Planning Rule ........ 17

IV. PLAINTIFF IS NOT ENTITLED TO ITS REQUESTED RELIEF ........ 20

CONCLUSION ........ 20

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alliance for the Wild Rockies v. Petrick*,
68 F.4th 475 (9th Cir. 2023) .......... 18

*Ariz. Mining Reform Coal. v. U.S. Forest Serv.*,
172 F.4th 641 (9th Cir. 2026) .......... 9

*Baker v. U.S. Dept. of Agric.*,
928 F.Supp. 1513 (D. Idaho 1996) .......... 5

*Cal. Cmtys. Against Toxics v. EPA*,
688 F.3d 989 (9th Cir. 2012) .......... 20

*Cascadia Wildlands v. U.S. Bureau of Land Mgmt.*,
153 F.4th 869 (9th Cir. 2025) .......... 13

*Clouser v. Espy*,
42 F.3d 1522 (9th Cir. 1994) .......... 5

*Cowpasture River Preservation Association v. Forest Service*,
911 F.3d 150 (4th Cir. 2018) .......... 19

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
141 F.4th 976 (9th Cir. 2025) .......... 10

*Drakes Bay Oyster Co. v. Jewell*,
747 F.3d 1073 (9th Cir. 2014) .......... 1

*Idaho Conservation League v. Lannom*,
200 F. Supp. 3d 1077 (D. Idaho 2016) .......... 7, 10

*Kleissler v. U.S. Forest Serv.,*
183 F.3d 196 (3d Cir.1999) .......... 18

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) .......... 16

*Lands Council v. Powell*,
395 F.3d 1019 (9th Cir. 2005) .......... 15

*Los Angeles v. F.A.A.*,
63 F.4th 835 (9th Cir. 2023) .......... 8

*Nat'l Wildlife Fed'n v. Espy*,
45 F.3d 1337 (9th Cir. 1995) .......... 20

*Native Ecosystem Council v. U.S. Forest Serv.*,

418 F.3d 953 (9th Cir. 2005) ........ 16

*Native Ecosystems Council v. Dombeck*,
304 F.3d 886 (9th Cir. 2002) ........ 18

*Native Ecosystems Council v. Weldon*,
697 F.3d 1043 (9th Cir. 2012) ........ 16

*Okanogan Highlands All. v. Williams*,
236 F.3d 468 (9th Cir. 2000) ........ 11, 13

*Oregon Natural Desert Association v. U.S. Forest Serv.*,
957 F.3d 1024 (9th Cir. 2020) ........ 16

*Public Lands for the People, Inc. v. U.S. Dep't of Agric.*,
697 F.3d 1192 (9th Cir. 2012) ........ 5

*Rock Creek All. v. U.S. Forest Serv.*,
703 F. Supp. 2d 1152 (D. Mont. 2010) ........ 11

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025) ........ 1, 2, 4, 9

*Westlands Water Dist. v. U.S. Dep't of Interior*,
376 F.3d 853 (9th Cir. 2004) ........ 4

*Wild Virginia v. United States Forest Service*,
24 F.4th 915 (4th Cir. 2022) ........ 19

**Statutes**

16 U.S.C. § 1604(f)(4) ........ 17

30 U.S.C. § 1607(c) ........ 20

**Regulations**

36 C.F.R. § 219.13 ........ 18

36 C.F.R. § 219.13(a) ........ 17

36 C.F.R. § 228.8 ........ 10

36 C.F.R. §§ 219.8(b)(1) ........ 17, 18

40 C.F.R. § 1502.14(a) (2019) ........ 8

**TABLE OF ACRONYMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| ASAOC | Administrative Settlement Agreement and Order on Consent |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| DEIS | Draft Environmental Impact Statement |
| EIS | Environmental Impact Statement |
| FEIS | Final Environmental Impact Statement |
| MMP | Modified Mine Plan |
| NEPA | National Environmental Policy Act |
| NFMA | National Forest Management Act |
| ROD | Record of Decision |
| SDEIS | Supplemental Draft Environmental Impact Statement |
| SFSR | South Fork Salmon River |
| SGP | Stibnite Gold Project |
| SOF | Statement of Facts |
| TSF | Tailings Storage Facility |

## INTRODUCTION

The Forest Service spent years carefully analyzing the potential environmental effects of the Stibnite Gold Project, including potential effects on tribal rights and access. The comprehensive Administrative Record contains voluminous and detailed scientific models and technical reports, resource specialist and mitigation reports, consultation documents, responses to public comments, and more. The record leaves no doubt that the agency thoroughly considered the potential impacts of Perpetua's proposal to carry out its statutory right to mineral development on National Forest System lands, imposed mandatory measures to minimize impacts to Forest resources, and ensured consistency with Forest Plan provisions and regulations.

Against this backdrop, Plaintiff's claims fail. Plaintiff wants the Forest Service to consider additional alternatives and to further document consistency with Forest Plan Standard SWST07 and the agency's Planning Rule in the particular manner Plaintiff prefers. But the Forest Service met all its legal obligations, and these largely procedural quibbles do not show otherwise. Under the Administrative Procedure Act's (APA) highly deferential standard of review, a court need not agree with an agency's decision or determination, *see Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180 (2025), but must uphold the decision "so long as the agency's path may reasonably be discerned," *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1087 (9th Cir. 2014) (citation modified). The Forest Service's determinations here are reasonably discernible and fully supported by the record. The Court should grant summary judgment for Federal Defendants.

## ARGUMENT

### I. THE FOREST SERVICE FULLY COMPLIED WITH NEPA

The purpose and need statement in the Final Environmental Impact Statement (FEIS) complies with all regulatory and statutory requirements and properly focuses on Perpetua's mining

proposal. *See* Fed. Defs.' Br. 8-15, Dkt. No. 46-2. The Forest Service considered a reasonable range of alternatives, twice took public comment on its draft alternatives, and fully explained its reasons for eliminating certain alternatives from further review at various stages of the process. *Id.* at 15-21. The agency's analysis and ultimate selection of an alternative modified by more than 160 mitigation measures falls well within the "broad zone of reasonableness" under which courts must afford agency choices substantial deference. *Seven Cnty.*, 605 U.S. at 183.

In response, Plaintiff continues to rely on a contrived narrative suggesting the Forest Service was improperly influenced by Perpetua in finalizing language in its purpose and need statement and analyzing alternatives. Pl.'s Resp. 1-17, Dkt. No. 47. Plaintiff's arguments are factually wrong, fail to acknowledge the rationale in the FEIS, and are belied by the record.

### A. The Forest Service Rationally and Reasonably Relied on Fewer Alternatives in the SDEIS and FEIS than in the DEIS.

#### 1. Elimination of DEIS Alternatives 1, 2, and 3 was reasonably explained.

The Draft Environmental Impact Statement (DEIS) explained that Alternative 1 represented Perpetua's then-proposed plan of operations and Alternative 2 included more environmentally protective measures Perpetua had developed but not yet incorporated into its proposed plan. FS218465. Alternative 1 was included in addition to its revised version (Alternative 2) because it still represented Perpetua's official plan of operations. *Id.* Before preparing the Supplemental DEIS (SDEIS), the Forest Service explained to Plaintiff that DEIS Alternatives 1 and 2 no longer represented the proposed plan and would not move forward. FS434150. Plaintiff does not explain why it was unreasonable for the agency to replace prior versions of Perpetua's plan with the revised version that reduced impacts: the 2021 Modified Mine Plan (MMP).[1]

---

[1] This plan was first submitted in December 2020 and is also referred to as ModPRO2. A refined version of ModPRO2 submitted in October 2021 became the final submitted proposed plan of

The DEIS explained that the Forest Service developed Alternative 3 "to address issues related to waters of the United States and federally protected fish species[.]" FS434150. But as the agency subsequently explained to Plaintiff, "[a]fter review of the analysis presented in the DEIS, it was clear that Alternative 3 did not provide the mitigation benefits it was developed for." FS434150. Far from a "cursory" explanation for its elimination, *see* Pl.'s Resp. 11 n.4, FEIS Section 2.6 explains in detail why Alternative 3 was not carried forward. FS243860-67. The FEIS highlights various components analyzed in Alternative 3 but dismissed when that analysis revealed no environmental benefits. *See, e.g.* FS243864 (alternate tailings storage facility (TSF) location); FS243864 (alternative transmission line route); FS243865 (alternate worker housing facility site). Plaintiff had the opportunity to comment on this analysis in the SDEIS but has not argued that the reasons given for eliminating Alternative 3 were unsound, nor suggested any benefit to carrying forward an alternative that did not provide environmental benefits compared to the 2021 MMP.[2]

DEIS Alternative 4 was carried forward as the Johnson Creek Route Alternative. FS218465. Plaintiff's apparent misinterpretation of the Forest Service's statement that it expected "to analyze the proponent's current plan of operations, and the two transportation routes identified in the DEIS (The Burnt Log route and the Johnson Creek route)," FS434150, as a commitment to "develop a new suite" of alternatives," Pl.'s Resp. 12, is far from reasonable.

---

operations—the 2021 MMP. FS243699; FS420771. Plaintiff does not dispute that the 2021 MMP was more environmentally protective than DEIS Alternatives 1 and 2. FS243699.

[2] Relatedly, Plaintiff makes an odd assertion that the DEIS was "unfinished," Pl.'s Resp. 9, 13 (claiming the "Forest Service never completed the alternatives analysis in the DEIS"). But the DEIS was, by definition, a "draft." Pursuant to governing regulations, the draft identified where more data was needed at the time, FS219350-51, the Forest Service continued to request and gather data from Perpetua, and those data gaps had been resolved by the time the agency issued the FEIS. Plaintiff provides no legal or logical basis for the assertion that the Forest Service should have "finished" the DEIS by comparing the 2021 MMP to all existing DEIS alternatives, even if some of those alternatives were obsolete or no longer provided a potential environmental benefit.

The FEIS summarized the agency's rationale for considering the two final action alternatives, including determinations confirming that the changes made in the 2021 MMP in response to public comments were "supported by updated data and analysis that identify opportunities to reduce potential environmental impacts." FS243733. The 2021 MMP itself (which was made available to the public along with the SDEIS) includes a detailed table comparing the environmental impacts of the four action alternatives in the DEIS with the 2021 MMP. FS200315-19. It was thus entirely reasonable for the Forest Service to conclude it did not need to carry forward Alternatives 1 and 2 because the 2021 MMP addressed key environmental concerns identified in the DEIS. Fed. Defs.' Br. 20. And the Court must "afford substantial deference" to an agency's identification of "feasible alternatives." *Seven Cnty.*, 605 U.S. at 181.

**2. The purpose and need statement in the FEIS did not preordain selection of the 2021 MMP or result in the elimination of DEIS alternatives.**

The FEIS's revised purpose and need statement is consistent with the agency's regulatory and statutory obligations and did not "preordain" any outcome. *See* Fed. Defs.' Br. 9-15. Plaintiff mischaracterizes Federal Defendants' arguments as suggesting the agency had no authority to consider alternatives to the 2021 MMP under the Mining Law. Pl.'s Resp. 5-8. But Federal Defendants merely explained that, because Perpetua has a statutory right to develop its mine claims under the Mining Law and the Forest Service is obligated to consider its proposal, it was reasonable to frame the statement around evaluation of Perpetua's current proposed plan. Fed. Defs.' Br. 9-10. *See Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 866 (9th Cir. 2004).[3]

[3] In maintaining its flawed argument that the agency "presumed" the 2021 MMP lawful because it assumed, *for purposes of environmental analysis*, that it could be authorized under existing authorities, Pl.'s Resp. 1, Plaintiff ignores the critical context for that statement provided in the FEIS: "However, a final determination regarding Forest Service authorizations for the proposed uses will not be made until the Record of Decision." FS245384; Fed. Defs.' Br. 12.

The cases Plaintiff relies on are not to the contrary. Neither *Clouser v. Espy*, 42 F.3d 1522 (9th Cir. 1994) nor *Public Lands for the People, Inc. v. U.S. Dep't of Agric.*, 697 F.3d 1192 (9th Cir. 2012), involved the National Environmental Policy Act (NEPA), let alone purpose and need statement or alternatives analysis challenges. Both cases stand for the proposition that the Forest Service can regulate mining on National Forest System lands even where proponents hold valid mining claims, just as the Forest Service did here by imposing more than 160 mitigation measures beyond what Perpetua proposed in the 2021 MMP. *See* Fed. Defs.' SOF ¶ 84, Dkt. No. 46-1. Neither case suggests that a purpose and need statement cannot reference a mine proposal by name or that mitigation measures imposed through the decision and not initially presented as action alternatives are somehow insufficient. To the contrary, "no mining activity can proceed until the Forest Service has evaluated the Plan and imposed mitigation measures." *Baker v. U.S. Dept. of Agric.*, 928 F.Supp. 1513, 1518 (D. Idaho 1996).

Moreover, the FEIS and ROD make clear that the Forest Service understood it could consider and select alternatives other than the 2021 MMP. Of the two action alternatives analyzed in detail in the FEIS, only one is the 2021 MMP as proposed, *see* FS243738-854. The "Johnson Creek Route Alternative," *see* FS243854-59, is a different alternative than the 2021 MMP and "was developed by the Forest Service and the cooperating agencies to evaluate potential reductions from access related effects." FS243733. The Forest Service crafted a new alternative other than Perpetua's proposed 2021 MMP and thus plainly did not "preordain" selection of the 2021 MMP by revising the purpose and need statement to refer to the proposal by name. Moreover, the Forest Service selected the 2021 MMP *modified to require* additional protective measures. FS420783-803; FS420823-903. Plaintiff barely acknowledges the extensive required mitigation measures and does not grapple at all with how they undermine its "presumption" argument.

Nor did the Forest Service rely on the revised statement in eliminating alternatives 1, 2, and 3 from further consideration. The Forest Service explained in both the SDEIS and FEIS that "[p]otential alternatives and component options were screened based upon four criteria," whether an alternative: (1) meets the purpose and need; (2) would potentially reduce environmental effects to at least one resource; (3) is technically feasible; and (4) is economically feasible. FS226426-27 (SDEIS); FS243732-33 (FEIS). "Options not meeting the purpose and need . . . were documented and eliminated first," and duplicative options were also eliminated. FS226427; FS243733. The Record shows that DEIS Alternatives 1, 2, and 3 were not eliminated for not meeting the project purpose and need. Rather, as described above, DEIS Alternatives 1 and 2 were screened out as similar to the 2021 MMP but lacking the latest revisions and protective measures, and DEIS Alternative 3 was screened out for not meeting Criteria 2—potentially reducing environmental effects to at least one resource. Plaintiff cannot show that the Forest Service relied on its purpose and need statement (revised or not) in narrowing the alternatives carried forward into the FEIS.[4]

**3. The Forest Service did not improperly rely on Perpetua's "NEPA path forward" memoranda.**

Plaintiff attempts to make much of two memoranda Perpetua shared with the Forest Service after first submitting the 2021 MMP, which provided Perpetua's "views on a NEPA path forward." FS192807. Plaintiff claims the Forest Service simply adopted Perpetua's recommendations without any analysis, going so far as to suggest the agency was "deceptive" by not referencing the memorandum in the FEIS. *See* Pl.'s Br. 11-12. But Plaintiff's narrative has no factual support. The memoranda, like hundreds of other technical memoranda and proposals Perpetua shared

[4] Alternatives screened out for not meeting the purpose and need *before* release of the DEIS were eliminated based on the prior formulation of the statement, which Plaintiff prefers. FS262581-618. Thus, many of the alternatives Plaintiff alleges were improperly screened out based on the new purpose and need statement, Pl.'s Resp. 8-9, had already been eliminated before it was revised.

throughout the process of submitting and refining its proposed plan, was part of the publicly available project record and was not "confidential." *See* FS243700 ("Additional documentation describing the EIS process, the analyses of the effects of the alternatives considered, public involvement, and other relevant documents may be found within the project record located at the Forest Service's Payette National Forest Supervisor's Office."). And while the Forest Service's path forward aligned with some of Perpetua's suggestions, it diverged from the company's strong recommendation that an SDEIS was not warranted. [5] *See* SOF ¶¶ 35-36.

Plaintiff suggests the Forest Service could not have independently evaluated Perpetua's recommendations in the two weeks that elapsed between the June 22, 2021 memoranda and the July 12, 2021 letter to Plaintiff describing next steps. *See* Pl.'s Br. 11. But the MODPro2 that became the 2021 MMP was first submitted to the Forest Service in December 2020. FS243699. And long before Perpetua ever shared its June 2021 memoranda, the Forest Service and its NEPA contractor had begun independently assessing MODPro2 against the existing alternatives and flagging which DEIS alternatives might not meet the environmental screening requirement. *See, e.g.*, FS017418-25 (analysis of changes between the prior mine plan and MODPro2).

Finally, Plaintiff provides no authority for its claim that NEPA required the Forest Service to "disclose" or reference the memoranda in the FEIS. *See* Pl.'s Resp. 11. *Idaho Conservation League v. Lannom*, 200 F. Supp. 3d 1077 (D. Idaho 2016), is inapposite. There, the Forest Service acknowledged that "confidential" meetings with the mine proponent had shaped its alternatives,

---

[5] Save the South Fork Salmon sent a letter to the Forest Service advocating the opposite position from Perpetua—that NEPA required the Forest Service to prepare and release an SDEIS for additional public comment following receipt of ModPRO2. FS014362 ("[W]e believe it would be a clear violation of NEPA for the Payette National Forest to proceed to a Final EIS and Record of Decision based on the ModPRO2."). Though the Forest Service's final decision to prepare an SDEIS directly aligned with Save the South Fork's position as articulated in its letter, Plaintiff does not accuse the Forest Service of improperly adopting the reasoning in that letter.

analysis, and conclusions. *Id.* at 1089 ("Under NEPA, the agency cannot rely on material that is kept secret from the public."). By contrast, the memoranda Plaintiff cites here were part of the publicly available project record and were not marked confidential, redacted, or withheld from the Administrative Record. That Plaintiff chose not to request access to all project documents does not mean the agency "withheld" information from the public. The Forest Service sufficiently explained its own conclusions and reasoning, and the Court should reject Plaintiff's attempt to fabricate a NEPA violation out of unsolicited memoranda the agency considered but did not adopt.

**B. The Range of Alternatives Considered in the FEIS is Reasonable and Lawful.**

In addition to challenging the elimination of certain alternatives between the DEIS and FEIS, Plaintiff maintains its claim that other alternatives were improperly eliminated from detailed analysis in the DEIS. As Federal Defendants have explained, these arguments fall far short of demonstrating a NEPA violation and fail to give adequate deference to the agency's selection of alternatives. Fed. Defs.' Br. 18-21. NEPA only requires a "brief[]" discussion of the "reason(s) for eliminating an alternative that was explored, but not developed in detail," 40 C.F.R. § 1502.14(a) (2019), and the Forest Service fully satisfied that obligation here. *See* FS243860-67 (explanation in FEIS); FS262585-618 (explanation in Alternatives Development Report); FS245549-55 (explanation in FEIS Appendix B: Response to Comments). And the Forest Service considered two action alternatives, which more than satisfied NEPA. *See Los Angeles v. F.A.A.*, 63 F.4th 835, 847 (9th Cir. 2023) ("We have approved of an agency's decision to compare the proposed action to only a no action alternative where the circumstances justified that choice.").

An alternative TSF liner component was sufficiently analyzed in the FEIS. *See* FS245465; FS262596. The Alternatives Development Report makes clear that "significant issues were addressed in alternative development process in three ways: (1) developing an alternative that is

included in the EIS; (2) *developing a potential mitigation measure*; and (3) considered but eliminated from further evaluation." FS262587 (emphasis added). The Forest Service noted that it would consider an alternative TSF liner as a potential mitigation measure, FS262596, and appropriately analyzed the effects of the liner design and potential liner leakage on the environment, taking State permitting requirements into account. *See* FS243787; FS244684-93. The agency noted that "no significant increases in concentration [of cyanide or other pollutants] are predicted as a result of the TSF, which relates to the very low expected seepage volumes from the facility." FS244693; *see also* FS243787 (noting the proposed liner system is expected to meet State permitting requirements); FS244706 (discussing permit). Far from creating a "loophole," Pl.'s Br. 4, the Forest Service's choice to consider an alternative liner requirement as a potential mitigation measure was reasonable and should not be disturbed. *Seven Cnty.*, 605 U.S. at 183.

In comments on the SDEIS, Plaintiff critiqued the two action alternatives as insufficiently protective of tribal treaty rights but only broadly suggested a different alternative: "The Forest must develop and include in the SDEIS all reasonable alternatives that protect Nez Perce treaty rights and resources." FS245549. The Forest Service's response referencing its screening process and effects analysis was commensurate. *Id.* Indeed, the Forest Service provided sufficiently proportionate levels of detail in responding to each of Plaintiff's alternative proposals and explaining why they were not analyzed further. *See* FS245549-53. As the Ninth Circuit recently held, "it will always be possible to identify some argument, raised by some stakeholder, that could have been analyzed in more detail in the FEIS," but ultimately, as long as the record shows the agency did not ignore the comments and had a rational basis for its decision, the "arguments about the relative detail [the agency] afforded particular comments must fail." *Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, 172 F.4th 641, 660 (9th Cir. 2026) (quoting *Seven Cnty.*, 605 U.S. at 181).

At bottom, the "deferential standard" of review the Court must apply allows the agency "significant discretion to choose parameters that narrow its alternatives analysis." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 141 F.4th 976, 998 (9th Cir. 2025). Accordingly, the Court should reject Plaintiff's NEPA claims.

## II. THE FOREST SERVICE FULFILLED ITS ORGANIC ACT OBLIGATIONS

The more than 160 new mitigation measures, terms and conditions, and other requirements upon which it conditioned approval of the 2021 MMP demonstrate that the Forest Service met its obligation to "minimize adverse environmental impacts on National Forest surface resources" where feasible. 36 C.F.R. § 228.8; *see* Fed. Defs.' Br. (citing SOF ¶ 84; FS420783-803).

In response, Plaintiff concedes that it "is not, for purposes of its Organic Act claim, challenging the practicability or effect of specific mitigation measures to ModPRO2." Pls.' Resp. 18. This leaves only a derivative Organic Act claim tied to Plaintiff's NEPA claims, which fails for all the reasons described above and because neither the Organic Act nor the Forest Service's Part 228 Regulations require an alternatives analysis. Indeed, Plaintiff misstates law and fact in asserting that "the record does not support the Forest Service's determination that it *evaluated* '*all* practicable measures' as required by 36 C.F.R. § 228.8." Pls.' Br. 18 (first emphasis added). Nothing in Section 228.8 requires the Forest Service to "evaluate" potential mitigation measures and document that analysis. It requires only that mining operations "be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources," 36 C.F.R. § 228.8, including taking "all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations," *id.* at § 228.8(e).[6] The Forest Service

---

[6] *Idaho Conservation League v. Lannom* is irrelevant to this inquiry. *See* Pls.' Resp. 18-19 (citing 200 F.Supp.3d at 1091-93). There the Court found the Forest Service's NEPA analysis lacking when it did not reasonably support the agency's determination, under specific requirements of the

determined that, based on the stringent mitigation measures required as part of the ROD, "[a]ll practicable means to avoid or minimize environmental harm from the alternative selected have been adopted." FS420804. Nothing in the Record undermines this determination.

Indeed, as explained above, the Forest Service considered many more than the two action alternatives it analyzed in detail in the FEIS, including various components with potential environmental benefits. The agency explained its reasons for eliminating all those not carried forward in the final analysis—often because those alternatives were not technically or economically *feasible*. FS243860-67; FS262585-618. Thus, even accepting Plaintiff's novel argument that the agency must use its NEPA alternatives analysis to determine whether it has considered all practicable and feasible mitigation measures to comply with the Organic Act and 228A Regulations (an argument which, to be clear, has no basis in either statute or implementing regulations) the Forest Service did consider a wide range of alternatives and potential protective measures and explained why certain alternatives were not feasible. No legal authority requires the Forest Service to carry forward the most environmentally preferable alternative. In fact, binding caselaw dictates the opposite. *Okanogan Highlands All. v. Williams*, 236 F.3d 468, 478 (9th Cir. 2000) (Organic Act does not require that "environmental interests always trump mining interests").

Plaintiff has failed to demonstrate that the numerous additional mitigation measures the Forest Service required when it approved the 2021 MMP, SOF ¶¶ 35-36, are insufficient to meet the agency's general obligations under the Organic Act to require feasible and practicable measures that minimize adverse environmental impacts. The Court should reject this claim.

---

*Wilderness Act* (not at issue here), that authorized encroachments in Wilderness areas were the "minimum necessary." *See Lannom*, F.Supp.3d at 1089, 1091-93. The Court was not reviewing whether the Forest Service had met the "general requirements" of the Organic Act, *see Rock Creek All. v. U.S. Forest Serv.*, 703 F. Supp. 2d 1152, 1172 (D. Mont. 2010), nor suggesting an alternatives analysis requirement under that statute or its implementing regulations.

## III. THE PROJECT COMPLIES WITH NFMA

### A. The Project is Consistent with SWST07.

Plaintiff argues the Project is inconsistent with SWST07 because it will not affirmatively improve water quality in Sugar Creek and because the Forest Service did not individually list surface water predictions for each 303(d)-listed water body in the mine area. Both arguments fail.

#### 1. The Forest Service's water chemistry predictions for Sugar Creek are consistent with SWST07.

The Forest Service carefully analyzed water chemistry, including potential surface water impacts from different project components, in excruciating detail. *See, e.g.,* FS244663-774 (FEIS Section 4.9); FS248676-893 (Water Quality Specialist Report). The results of the detailed water chemistry modelling for various mine components and facilities with potential to affect water quality were then "incorporated into a site-wide water chemistry (SWWC) model to provide an overall prediction of surface water concentrations in Meadow Creek, the East Fork [South Fork Salmon River (SFSR)], West End Creek and Sugar Creek." FS244726. These models "were coupled with surface and groundwater flow predictions from the site-wide water balance and hydrogeological model," to predict and quantify surface water quality impacts "at a series of prediction nodes downgradient of the mine facilities." FS244726; *see also* FS244728 (4.9-21). "To minimize the volumes of contact water encountering project disturbance and requiring treatment, the project would divert upstream non-contact water to prevent it from interacting with [Stibnite Gold Project (SGP)] facilities during operations." FS244729-30. Synthesizing all this technical modelling, which properly considered mitigation measures that will reduce impacts, *see* FS126261-422 (Water Quality Management Plan), the agency concluded that "[e]ffects of the project on surface water concentrations are expected to be negligible relative to applicable standards and calculated human health criteria, permanent, and localized." FS244734; FS252430

(noting SWST07 consistency "addressed by [the] water quality management plan").

Plaintiff points to no data in the record undermining the Forest Service's overall determination, based on complex models, that the Project's effects on surface water concentrations of arsenic and mercury are expected to be negligible. Instead, Plaintiff points to the agency's acknowledgment that, in the post-operations period, closure activities may result in slight increases in arsenic and mercury in Sugar Creek. FS244734. But Plaintiff ignores the prior sentence explaining that "[d]uring the construction, operations, and post-closure periods, predicted water chemistry in Sugar Creek differs very little from baseline conditions (SRK 2021b)."[7] *Id.* The agency's determination that West End Creek mercury treatments required under the Record of Decision (ROD) will ensure no increase in mercury loading into Sugar Creek during operations, FS420897, is supported by the record and entitled to deference. The National Forest Management Act (NFMA) does not require express analysis of "the efficacy of such treatment at reducing mercury levels in Sugar Creek," *see* Pl.'s Resp. 23, for the agency's consistency determination to be reasonable. *See Cascadia Wildlands v. me*, 153 F.4th 869, 906 (9th Cir. 2025) (deference must be "at its apogee" when reviewing an agency's technical or scientific expertise and a court should not order an "agency to explain every possible scientific uncertainty." (citation omitted)).

Plaintiff also erroneously asserts that consistency with SWST07 requires the Project to

[7] The Forest Service also predicted that minor arsenic fluctuations at nodes both above and below confluences with Sugar Creek will result in an overall "decrease relative to existing conditions during the operating period," and that mercury conditions will fluctuate but "return to concentrations comparable to existing conditions post-closure." FS244733. Plaintiff correctly points out that the prediction nodes associated with these statements are not placed on Sugar Creek itself, and the statements about current and predicted conditions at those nodes thus refer to West End Creek and East Fork SFSR. Pl.'s Resp. 21-22. But the agency's predictions that contaminants will either decrease or remain below standards in water bodies that both contribute surface water to Sugar Creek (node YP-T-6 just above the confluence of Sugar Creek) and receive surface water from Sugar Creek (node YP-SR-2 just below the confluence with Sugar Creek), still support its Sugar Creek-specific prediction of only negligible increases from the Project. FS244733.

affirmatively *improve* water chemistry in all 303(d)-listed waterbodies in the Project area. Not so. The standard requires only that the agency "maintain" overall progress toward attainment. FS003277. As Plaintiff acknowledges, Sugar Creek and the other 303(d)-listed water bodies in the Project area are *currently* listed as impaired, meaning their surface water concentrations of certain pollutants already exceed permitted levels for reasons unrelated to the Stibnite Project.[8] *See* FS245027. Indeed, even under the "no action" alternative, "[t]he inventoried waterbodies at the Operations Area Boundary would continue to be listed as impaired (except for West End Creek) for specific uses in accordance with CWA Section 303(d) due to arsenic (plus antimony and mercury at some locations) . . . until the [Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA)] actions under ASAOC[9] take place at which time the conditions of the surface water are expected to improve. FS245019; *see also* FS126290 ("while overall water quality in the Project site should improve, it may not be possible to reduce overall concentrations in surface waters to concentrations below applicable Idaho criteria because: (1) the water expected to be managed and treated by [Perpetua] is a small proportion of the overall surface water flowing through the Project site in the EFSFSR and its tributaries, and (2) there are naturally mineralized conditions over several square miles within the vicinity of the site" (internal citations omitted)).

---

[8] The water quality threshold for mercury that is applicable to 303(d) listing and attainment is 12 ng/L. FS244056; FS248700. Plaintiff cites EPA human health mercury criteria for fish ingestion, *see* Pl.'s Resp. 21 n.11, which is not relevant to Sugar Creek's 303(d) attainment. Sugar Creek's status as 303(d)-listed for mercury is caused by upstream concentrations outside the mine area including "existing upstream contributions from Cinnabar Creek, a tributary to Sugar Creek." FS244734; *see also* FS248729 ("Although elevated concentrations of mercury are observed in Sugar Creek, these concentrations have a well-documented source in the upstream Cinnabar (mercury) Mine located outside the proposed SGP mine area."). Thus, "effects *of the project* on surface water concentrations are expected to be negligible relative to applicable standards and calculated human health criteria, permanent, and localized." FS244734 (emphasis added).

[9] The ASAOC (Administrative Settlement Agreement and Order on Consent) is a 2021 agreement pursuant to CERCLA under which Perpetua will remove legacy mining material from past operations in the area. FS243649. It is distinct from the Stibnite Gold Project.

Thus, "progress" toward attainment will require actions beyond the scope of the Project.

Accordingly, the Forest Service made a reasoned determination that predicted water quality fluctuations from Project operations, which will be minimized or eliminated through planned water treatment and other mitigation measures, will maintain progress toward attainment. Plaintiff misreads SWST07 to suggest it "restricts the Forest Service from authorizing activities that cause pollutant level trendlines in listed waterbodies to remain static," Pl.'s Br. 22, but the text of SWST07 does not support this interpretation. Faulting the Project for existing conditions contravenes the Ninth Circuit's holding in *Lands Council v. Powell*, 395 F.3d 1019, 1035-36 (9th Cir. 2005) (no violation of plan standard where baseline inconsistency not attributable to project).

**2. SWST07 does not require individual modelling for each water body.**

Plaintiff next argues that NFMA requires the Forest Service to make specific, individual water chemistry predictions for each impaired water body within the Project area, rather than synthesizing complex and detailed modelling, combined with requirements in the Water Quality Management Plan, to determine that overall water chemistry impacts for relevant pollutants would be negligible. *See* Pl.'s Resp. 23-25. But as described above, the Forest Service's reliance on water chemistry modelling and required water treatment and other mitigation measures to find SWST07 compliance for all relevant water bodies was reasonable and is well supported by the Record.

Plaintiff's contrary argument continues to improperly blur the analysis requirements under NEPA—where the Forest Service must document and explain its analysis and conclusions regarding potential environmental effects in the FEIS—with NFMA's distinct consistency requirement. *See, e.g.*, Pl.'s Resp. 25 (alleging lack of "analysis in the record supporting the Forest Service's compliance determination"). In *Oregon Natural Desert Association v. U.S. Forest Service*, the Ninth Circuit explained that courts may identify clear errors illustrating *substantive*

noncompliance with binding forest plan standards in a NEPA document. 957 F.3d 1024, 1033-34 (9th Cir. 2020) (collecting cases). But the court did not hold that the agency violated NFMA by not sufficiently *explaining* why an action was consistent with a particular standard. Alleged lack of affirmative explanation is not enough to prove a NFMA violation, and in arguing that the agency must conduct certain analysis, documentation, and modelling efforts in the particular manner Plaintiff prefers (prediction nodes and individual analysis for each listed water body), despite no requirement to do so in the plain text of SWST07, Plaintiff fails to afford the "substantial deference" due to the agency's interpretation and implementation of its own Forest Plan. *Id.* at 1035 (citing *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012)).

The Court's sole inquiry is "whether [it] can reasonably discern from the record that the Forest Service complied" with the Forest Plan. *Native Ecosystem Council v. U.S. Forest Serv.*, 418 F.3d 953, 961-62 (9th Cir. 2005) (emphasis added). And the record illustrates that the Forest Service's approval was consistent with SWST07. *See supra* pp. 12-15; Fed. Defs.' Br. 24-27. The reviewing court must "give the Forest Service ample latitude in ensuring the consistency of its actions with Forest Plans," and may "conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan." *Or. Nat. Desert Ass'n*, 957 F.3d at 1035 (citing *Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008) (en banc)). The record reveals no such error here.

At bottom, the Forest Service reasonably determined that the Project is consistent with SWST07 because it will ultimately result in the same or lower surface water concentrations in 303(d)-listed waterbodies, so there will be no delay in progress towards beneficial use attainment. Plaintiff fails to show the agency made a clear error in judgment in reaching this conclusion.

**B. The Forest Service Complied with the 2012 Planning Rule.**

Under NFMA, the Forest Service may amend a plan "in any manner whatsoever," 16 U.S.C. § 1604(f)(4), and the Planning Rule emphasizes that the agency "has the discretion to determine whether and how to amend the plan and to determine the scope and scale of any amendment." 36 C.F.R. § 219.13(a). The Forest Service authorized six project-specific amendments that were thoroughly analyzed in Appendix A to the FEIS and supported by detailed analysis of the effects to each relevant resource in FEIS Chapter 4. SOF ¶¶ 58, 71. And it followed the Planning Rule's direction that, for such Project-specific amendments, the agency first "[d]etermine which specific substantive requirement(s) within §§ 219.8 through 219.11 are directly related to the plan direction being added, modified, or removed by the amendment," and "apply such requirement(s) within the scope and scale of the amendment," *id.* § 219.13(b)(5).

Plaintiff first fails to show that the Court should reach this claim at all. As Federal Defendants explained, Plaintiff never put the Forest Service on notice that it objected to the "not directly related" determinations the agency reached for 36 C.F.R. §§ 219.8(b)(1), (3), (5), and § 219.10(a)(6). Fed. Defs.' Br. 28-29. These claims, as illustrated by Plaintiff's response brief, are largely non-substantive and seek only more explanation in FEIS Appendix A. For example, Plaintiff argues that the agency did not adequately "show its work," Pl.'s Resp. 29, did not properly define the "purpose" of the amendments, *id.* at 29-30, did not cite the correct portions of its NEPA analysis, *id.* at 30, and should have documented why it found certain provisions "not directly related" to the proposed amendments in Appendix A, *id.* at 31. Indeed, in repeatedly arguing that Federal Defendants' explanations are "post-hoc," Plaintiff complains that the reasoning in the record should have been documented explicitly in Appendix A. *Id.* at 31-32.

Although these assertions fail on the merits, each could have been addressed with more

explanation during the NEPA process if Plaintiff had notified the agency of its specific concerns. Plaintiff claims it did so in comments on the DEIS, *see* Pl.'s Resp. 27, but fails to explain why generalized comments on the draft version of Appendix A and "an overview of the framework the Forest Service was required to use" provided notice of its specific complaints with the final version in the FEIS. *Id.* Similarly, Plaintiff's FEIS Objection states "in general terms" that "the Forest Service wrongly determine[ed] that amendments are 'not directly related' to many 2012 Planning Rule requirements." Pl.'s Resp. 28 (citing FS422095). But Plaintiff's FEIS Objection, like its DEIS and SDEIS comments, never stated that the Forest Service's "purpose" and "effects" analysis related to its "not directly related" determinations in Appendix A was insufficient—arguments now at the core of Plaintiff's legal challenge. *See, e.g.*, Pl.'s Resp. 29-31; *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 899 (9th Cir. 2002) ("[C]laims raised at the administrative appeal and in the federal complaint must be so similar that the district court can ascertain that the agency was on notice of, and had an opportunity to consider and decide, the same claims now raised in federal court." (quoting *Kleissler v. U.S. Forest Serv.,* 183 F.3d 196, 202 (3d Cir.1999)). As the Ninth Circuit held in *Alliance for the Wild Rockies v. Petrick*, a "vague and generalized statement," especially one "contained within more than a hundred pages of comments," does not "provide sufficient notice to the government of [Plaintiff's] current concerns." 68 F.4th 475, 488 (9th Cir. 2023). Plaintiff waived and failed to exhaust administrative remedies as to these claims.

If the Court does reach this claim, Federal Defendants have explained how the analysis set forth and referenced in FEIS Appendix A (FS245378-431) meets the agency's obligations under 36 C.F.R. § 219.13. Fed. Defs.' Br. 29-34. Plaintiff's response largely restates its opening arguments, which fall far short of showing a NFMA violation and do not overcome the agency's substantial discretion to implement Project-specific amendments under the Planning Rule.

Plaintiff's response relies heavily on *Cowpasture River Preservation Association v. Forest Service*, a non-binding case in which the Fourth Circuit faulted the Forest Service for not explaining that the purpose of its proposed plan amendments was to lessen environmental protections for certain resources to allow a proposed project to move forward, nor analyzing the substantive provision of the planning rule against that purpose. 911 F.3d 150, 162 (4th Cir. 2018), *rev'd sub nom.*, 590 U.S. 604 (2020). Here, however, Appendix A properly referenced the Project's purpose and need, including that the Forest Service must consider Perpetua's proposal "in connection with operations authorized by the U.S. mining law" FS245384; FS245411, and then (unlike the challenged analysis in *Cowpasture*) makes clear that the relevant amendments' purpose is to temporarily relax certain resource standards because Perpetua's proposal will exceed temporal limits on Forest impacts and will not provide Forest Plan-required fish passage in one area. *Id.*

Moreover, the Forest Service *did* find the proposed amendments "directly related" to a substantive provision regarding Tribal use of Forest resources, FS245319; FS245415, and there is no evidence in the record that the proposed amendments would cause "substantial adverse effects" to Tribal interests that render the amendment directly related to the other, broader provisions Plaintiff cites. *See* Fed. Defs.' Br. 33-34.[10] The Tribal Member Site Access Plan that will minimize adverse impacts to Tribal rights and access is not a "post-decisional" document—it was the subject of pre-decision consultation with Tribes, is mentioned in the FEIS, *see* FS251497, and was incorporated into the ROD as a requirement. FS008286-93; FS007605-14.

In sum, the Forest Service's analysis complied with the Planning Rule. And because

[10] *Wild Virginia v. United States Forest Service*, another non-binding case, is inapposite because there the Fourth Circuit found the Forest Service's analysis lacking in the *second* step of the Planning Rule's analysis process for Project-specific amendments: applying those provisions found "directly related" within the scope and scale of the amendments. 24 F.4th 915, 931 (4th Cir. 2022). Plaintiff does not challenge the Forest Service's application of directly related provisions.

Plaintiff did not properly raise its claim to the contrary during the administrative process, the Court need not reach Plaintiff's meritless arguments to enter summary judgment for Federal Defendants.

## IV. PLAINTIFF IS NOT ENTITLED TO ITS REQUESTED RELIEF

The "decision to grant or deny injunctive or declaratory relief under the APA is controlled by principles of equity." *See* Fed. Defs.' Br. 35 (quoting *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995)). Plaintiff's claims lack merit and it is not entitled to any relief, but should the Court rule in Plaintiff's favor on any of its claims, the Court should, at most, remand without vacatur to avoid the disruptive consequences of delaying a project that is essential to national security and military preparedness. Vacatur here would create disruptive consequences by impeding development of antimony, a critical mineral with various urgent defense applications that lacks reliable domestic production, and the Project will produce "the sole domestic geologic reserve of antimony that can meet Department of Defense requirements." SOF ¶ 105 (citing FS260601-02; FS244475-76). Congress has mandated such projects be permitted "with maximum efficiency and effectiveness." 30 U.S.C. § 1607(c). At a minimum, the Court should provide an opportunity for the Parties to submit remedy briefing elaborating on the equities at stake and tailored to the specific deficiencies identified by the Court, as the Court's determination of whether agency action should be vacated also "depends on how serious the agency's errors are," *see Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012)). And vacatur would be particularly unwarranted here given the narrow, procedural nature of all Plaintiff's claims.

## CONCLUSION

Plaintiff has not carried its heavy burden of showing the Forest Service's decision was unlawful, and the Court should grant summary judgment for Federal Defendants on all claims.

Respectfully submitted this 12th day of June, 2026.

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

*/s/ Emma L. Hamilton*
EMMA L. HAMILTON (CA Bar No. 325360)
Trial Attorney
Natural Resources Section
c/o United States Attorney's Office
201 Third Street, N.W., Suite 900
Albuquerque, New Mexico 87102
(202) 305-5689
emma.hamilton@usdoj.gov

BART M. DAVIS
United States Attorney
District of Idaho

*Attorneys for Federal Defendants*